THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
PETER WOODWARD II, Defendant-Appellant.

Second District   No. 78-72

Opinion filed October 11, 1979.

Mary Robinson and Ralph Ruebner, both of State Appellate Defender's Office, of Elgin, and Michael Mulder, of State Appellate Defender's Office, of Chicago, for appellant.

Dennis Ryan, State's Attorney, of Waukegan (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The defendant, Peter Woodward, who was 15 years old at the time of the alleged homicide and 16 years old at the time of trial, was convicted as

an adult of voluntary manslaughter in a jury trial and sentenced to 3-15 years' imprisonment. He appeals.

Defendant contends that section 2—7(3) of the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 702—7(3)) is unconstitutional because it does not set forth a specific burden of proof to be met prior to the transfer to adult jurisdiction; that the trial court violated the defendant's constitutional rights by failing to choose a less restrictive alternative; that the trial court erred in refusing to instruct the jury of the complete defense of self-defense; and that trial errors deprived him of a fair trial.

The State raises the additional issue that defendant's failure to file a post-trial motion operates as a waiver of all issues. The instructional error complained of, under the circumstances which will be hereafter detailed, however, rises in our view to one of "plain error" which we would feel constrained to review under Supreme Court Rule 615(a) (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a)).[1]

Defendant's initial claim that the transfer provisions of the Juvenile Court Act are unconstitutional in that they do not set forth a specific burden of proof to be met prior to the transfer to an adult jurisdiction has been decided against him in the recent Illinois Supreme Court case of *People v. Taylor* (1979), 76 Ill. 2d 289. The defendant now argues his further claim that due process required the State to show the least restrictive alternative as being employed and that this prevents the transfer as a matter of due process. The defendant reasons that since the legislature created a separate juvenile court system with jurisdiction over

---

[1] *People v. Hammond* (1977), 48 Ill. App. 3d 707, 708-09, claiming to be a case of first impression, held that the failure of a defendant to file any post-trial motion is deemed to be a waiver of any error raised on appeal. This holding has been cited with approval, and followed in the various districts without exception. (See, *e.g., People v. Schoo* (1977), 55 Ill. App. 3d 163, 165; *People v. Hasting* (1978), 56 Ill. App. 3d 724, 726; *People v. Turner* (1977), 52 Ill. App. 3d 738, 739.) In *People v. Pickett* (1973), 54 Ill. 2d 280, 282, the Illinois Supreme Court announced the general rule that where a defendant files a written post-trial motion he waives any issues not specified in the written motion. The extension of that rule to apply when no post-trial motion is filed may not be fully justified by *Pickett*. *Pickett* did not, for example, directly overrule cases which have held that if a defendant makes an oral motion for a new trial which specifies no grounds he will not be deemed to have waived any valid objection he might have to the proceedings in the trial, but "may avail himself of any cause for a new trial which may appear in the record" including the giving or refusing of instructions. (*People v. Cohen* (1933), 352 Ill. 380, 382. See also *People v. Prohaska* (1956), 8 Ill. 2d 579, 583; *People v. Irwin* (1965), 32 Ill. 2d 441, 444-45.) And there are earlier authorities that held that a criminal defendant who fails to file any post-trial motion will not be deemed to have waived any objectionable action by the trial court occurring during the trial, and found in the "Bill of Exceptions" including rulings on instructions, objections to evidence or other matters of law arising in the trial of the case. (See *Yarber v. Chicago & Alton Ry. Co.* (1908), 235 Ill. 589, 603. See also *People v. Gabrys* (1928), 329 Ill. 101, 102-03; *People v. Majczek* (1935), 360 Ill. 261, 267.) The report of proceedings under the 1933 Civil Practice Act, as amended, is the same as, and in lieu of the former "Bill of Exceptions" (*see Lambert v. Dabbs* (1939), 302 Ill. App. 400, 439; 2 Ill. L. & Prac. §411 (1953)) but similarly includes all "motions and rulings of the trial court, evidence heard, instructions and other matters which do not come within [the common law record.]" *People v. Engel* (1950), 406 Ill. 560, 563.

all juveniles, it follows implicitly that "non-criminal treatment is to be the rule—and the adult criminal treatment, the exception * * *," citing *Kent v. United States* (1966), 383 U.S. 541, 560, 16 L. Ed. 2d 84, 97, 86 S. Ct. 1045, 1057. He does not argue that a right to treatment as a juvenile is mandatory but that there is a "presumption" that he will be so treated, which must be overcome by a showing that the juvenile is not amenable to such treatment.

■■ It is generally true that a State cannot "unnecessarily burden or restrict constitutionally protected activity." (*Dunn v. Blumstein* (1972), 405 U.S. 330, 343, 31 L. Ed. 2d 274, 285, 92 S. Ct. 995, 1003.) However, the right to be prosecuted as a minor is not a constitutionally protected right; however, where a minor is so prosecuted he is entitled to the fundamental requirements of due process. (See *In re Gault* (1967), 387 U.S. 1, 19, 18 L. Ed. 2d 527, 541, 87 S. Ct. 1428, 1439.) To the extent that the State has extended a right or privilege to juveniles not protected by the constitution it still may not deprive the juvenile of that right without observing procedural safeguards. See, *e.g.*, *Goldberg v. Kelly* (1970), 397 U.S. 254, 261-63, 25 L. Ed. 2d 287, 295-96, 90 S. Ct. 1011, 1017-18.

■■ As applicable here, the State of Illinois need not demonstrate that no less restrictive alternative exists for the treatment of the accused minor so long as it satisfies the requirements of procedural due process in determining where and how the minor will be tried. Here there were no violations of the requirement of due process since the trial judge followed both the letter and spirit of section 2—7 of the Juvenile Court Act. Moreover, section 2—7 of the Juvenile Court Act is modeled on the provisions in effect in the District of Columbia Code, interpreted and implicitly approved in *Kent*, 383 U.S. 541, 554-56, 16 L. Ed. 2d 84, 93-94, 86 S. Ct. 1045, 1053-54.

The refusal of the trial court to instruct the jurors on the issue of self-defense in accordance with an instruction tendered by the defendant raises a serious question which requires a review of the facts and circumstances bearing on the homicide.

On the evening of May 14, 1977, the defendant was assisting his father in repairing a motorcycle in the back yard of the Woodward home in Zion. Selvin Hamilton, a 16-year-old boy who also lived in the neighborhood, walked into a vacant lot which adjoined the Woodward home holding a Doberman pinscher dog on a leash. According to the testimony of defendant's father, Hamilton was encouraging the dog to defecate near the senior Woodward's car, which resulted in a heated argument. In the course of the argument Hamilton is claimed to have said to the senior Woodward that the dog had a right to defecate any place he wanted to. Also in the course of the argument the senior Woodward threw a small propane tank at the animal. The defendant's father testified that

the dog then was brought by Hamilton directly onto his property, that the dog was snapping, growling, barking and lunging forward on the leash; that he told the boy that if he didn't take the dog and leave he was going to take a hammer to it. Again, according to the testimony of the defendant's father, Hamilton indicated that he was going home but that he would return very shortly with his ".44" and left the lot.

Woodward, Sr., testified that shortly thereafter a young boy who lived in the neighborhood told him that Selvin Hamilton was on his way back and that he had his gun with him. Defendant's father looked over in the direction of the Hamilton residence and saw Selvin returning to the scene of the argument this time with two dogs, one of which was a Doberman pinscher and the other a German shepherd; that Selvin "had his hands stuck inside of his jacket"; that Woodward, Sr., then went into the house and called the police; but that before the police arrived there was a confrontation between Selvin Hamilton and the defendant.

The defendant, while the confrontation between Hamilton and his father was going on, had gone into the house and secured a .22 gun which was "on the wall." He testified he was going to give the gun to his father but did not. The defendant left his residence by the front door and as he was going around the house to the back door saw Selvin Hamilton approaching the house again. At this time he saw the two dogs with Hamilton. Selvin called the defendant's name. The defendant testified: "I was getting really scared, I didn't know what to do." Defendant said that he was afraid that Hamilton would release the Doberman pinscher, which appeared to have a ferocious disposition, and he also feared that Selvin was carrying the .44 gun and that he would pull it on the defendant. Defendant further testified that Selvin Hamilton's Doberman pinscher "started growling, and then it jumped, like it was going to break loose of the leash * * *."

At this point, defendant said he fired in the general direction of Selvin Hamilton but the bullet missed Hamilton. The defendant testified that at the time of the first shot he did not intend to kill or injure Hamilton but merely intended to frighten him. Defendant testified that after the gun was fired the first time, Selvin Hamilton said "that ain't nothing but a pop gun." Defendant said that after making this statement Selvin began to laugh and "started to walk toward me * * *" and it was at this time that defendant fired a second time. Again, the defendant testified he was merely trying to frighten Hamilton into leaving him and his family alone. However, on this occasion, the bullet struck Selvin Hamilton who, although hurt, did not lose consciousness and returned to his home. Shortly thereafter an officer of the Zion police department arrived at the Hamilton residence. The victim, because of his condition, was unable to tell the officer what had happened. The officer assisted a paramedic in

moving Hamilton to the floor and at this time found a .77-caliber pellet gun, lying near the victim's right leg. The victim died at the hospital.

Defendant was charged with two counts of murder in Hamilton's death. Following the trial the jury returned a verdict of guilty of voluntary manslaughter.

At the close of the evidence the defendant's counsel tendered, among other instructions, Illinois Pattern Jury Instructions, Criminal, No. 24.06 (1968):

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

The trial judge, however, refused the instruction in this form and, instead, gave instructions on murder, voluntary manslaughter and involuntary manslaughter. The instruction given as to voluntary manslaughter pertained to section 9—2(b) of the Criminal Code (Ill. Rev. Stat. 1975, ch. 38, par. 9—2(b)), and was to the effect that in order to sustain the charge the State must prove that the defendant intentionally or knowingly performed the acts which caused the death of Selvin Hamilton and that when he did so he believed that circumstances existed which would have justified killing him and that the defendant's belief that such circumstances existed was unreasonable.

The result of the instructions given and refused was that the jury was informed that it could find the defendant guilty of voluntary manslaughter if it found that the defendant believed at the time of the crime that circumstances existed which would have justified the homicide but that his belief was unreasonable. However, the judge did not inform the jury in any way that if the defendant believed that it was necessary to shoot in his own self-defense and that the belief was reasonable he would have presented a complete defense to the crime.

It seems clear that if there is a jury question as to the reasonableness of the defendant's belief in the necessity for self-defense the judgment must be reversed for a new trial.

In *People v. Harris* (1976), 39 Ill. App. 3d 805, 811, the court held that it was "difficult to conceive of a situation where there would be evidence of a belief that deadly force was justified but where the evidence would be such that the issue of the reasonableness of that belief should not be submitted to the jury, and such a situation does not appear to have been contemplated by the drafters of IPI Criminal." The *Harris* court thus suggested that whenever a voluntary manslaughter instruction, based on

an "imperfect" defense of self-defense, is given in a murder case, an instruction on the "perfect" defense of self-defense should also be given. We find the reasoning in *Harris* persuasive.

It is, of course, true that the self-defense instruction would be proper only if the defendant produced "some evidence" of a reasonable belief in the necessity for the use of deadly force. (*Cf. People v. Bratcher* (1975), 29 Ill. App. 3d 202, 204.) It is true, as the State points out, that the defendant's defense of self-defense on the one hand, and of involuntary manslaughter, a defense in mitigation, on the other are somewhat inconsistent. This is so because self-defense suggests an intentional or knowing action which is justified by the circumstances; whereas involuntary manslaughter is based upon a reckless, nonintentional and nonknowing act. Further, the defendant's own testimony is somewhat inconsistent on this point. He testified that he fired at the victim because he was frightened. However, he also testified that he fired because the dog on the leash "jumped." The last statement suggests either reckless action on his part or an accident for which he was not at fault. Any such inconsistency in the defendant's own testimony, however, would not operate to bar the defendant's right to an instruction supported by "some evidence." "A defendant is entitled to the benefit of any defense shown by the entire evidence, even if the facts on which such defense is based are inconsistent with the defendant's own testimony." *People v. Scalisi* (1926), 324 Ill. 131, 145. See also *People v. Dortch* (1974), 20 Ill. App. 3d 911, 914; *People v. Bembroy* (1972), 4 Ill. App. 3d 522, 525.

■■ We conclude that under the circumstances in this record it was reversible error to refuse an instruction which would have given the defendant the right to present to the jury a theory of complete self-defense. There was testimony that the defendant had heard the victim say to defendant's father only a minute or two before the incident that he was returning home to procure a gun to kill the father. Further, an offer of proof was made to the effect that the victim had a reputation among children in the neighborhood for violence and aggression. There was further evidence that the defendant was aware of the victim's reputation for ferocity and belligerence. The offer of proof also indicated that the victim had a reputation for carrying a gun. Also, the victim indicated that he was going home to procure a gun and a gun was found near the victim as he lay on the floor of his own residence after the shooting even though it was only a .77 pellet gun. The evidence also indicated that the victim was carrying a pocket knife on his person at the time of the incident. While, as the State argues, the victim, even if he were armed with the .77 pellet gun and with a pocket knife, did not draw the gun or knife at any time before the defendant shot him, this does not destroy the defense. It is not necessary that an assailant have a deadly weapon in order to justify

the use of deadly force in repelling the threat posed by even an unarmed assailant. See *People v. Turner* (1944), 385 Ill. 344, 349.

While there is physical evidence and testimony by State's witnesses that tends to support the view that the victim turned away from the defendant and began retreating before the shot, the testimony by the defendant was to the contrary. He said that the victim, after the first shot was fired, told the defendant that he could see that the defendant was bearing "merely a pop gun" in his hands; and that after he made that disparaging remark he began to advance toward the defendant. While it is not entirely clear from the testimony how far the victim was from the defendant at the time of the shooting it appears that there was a distance of between 20 to 40 feet. If the defendant's version were to be believed a prospective attack on him, which the victim had the present ability to carry out, could be considered imminent. (See *People v. Williams* (1965), 56 Ill. App. 2d 159, 166.) And, of course, the entire circumstances are pervaded by the previous encounter between the victim and defendant's father in which, according to the defense testimony, the victim had threatened to murder the defendant's father only a few minutes before the incident. And there was the further circumstance that it was at least a jury question as to who had provoked the incident and the further consideration that the homicide occurred when the victim came upon defendant's property. See *People v. Bailey* (1973), 15 Ill. App. 3d 558, 561.

The defendant was entitled to his theory of defense even though in the view of the trial court the evidence to support it was inconsistent or of doubtful credibility (*cf. People v. Boisvert* (1975), 27 Ill. App. 3d 35, 42-43), and it was therefore reversible error to refuse the instruction. Here, the conclusion is reinforced by the fact that the trial court agreed that the jury should be allowed to decide on instructions that the defendant believed that deadly force was justified but were cut off from finding whether or not that belief was reasonable.

Since we have concluded that the judgment must be reversed and the cause remanded for a new trial we need not examine defendant's claim that the trial judge erred in refusing to conduct as complete an inquiry as defendant's counsel requested with reference to a racial remark allegedly made by one of the veniremen in the jury's assembly room, since a similar situation is not likely to occur on retrial.

For the reasons which we have stated the judgment is reversed and the cause remanded for a new trial.

Reversed and remanded.

WOODWARD and LINDBERG, JJ., concur.