THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIE EARL FOSTER, Defendant-Appellant.

First District (4th Division)   No. 78-1307

Opinion filed February 28, 1980.—Rehearing denied March 31, 1980.

Ralph Ruebner and Fe Fernandez, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Thomas J. Leanse, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Defendant, Willie Earl Foster, was convicted of murder in a jury trial and was sentenced to 15 to 20 years in the penitentiary. On appeal he contends he was denied a fair trial on the following grounds: (1) the trial court refused to give a jury instruction on self-defense; (2) the court barred defense testimony concerning the victim's reputation for violence; (3) the court erroneously instructed the jury that defendant had confessed; and (4) the prosecution commented on defendant's post-arrest silence in an improper manner.

We reverse and remand for a new trial.

Although defendant does not directly challenge the sufficiency of the evidence we will summarize that evidence as an aid in evaluating his contentions of prejudicial error. This case arose out of the stabbing death of Tom Stanford. Samella Morris, who had lived with Stanford and who had borne a child by him, testified for the State that the stabbing occurred in her apartment on the evening of September 5, 1977. She and Stanford had separated and moved out of that apartment seven months earlier. She had given the defendant a key to the apartment so he could watch it for her. On September 5, 1977, at about 11 p.m. Morris, Stanford, and a friend of Stanford returned to the apartment. The friend was asleep on a living room couch and Stanford and Morris were in the bedroom when defendant and his girlfriend entered the apartment. Defendant had a

large knife in his hand. When asked about it by Morris defendant stated that he had been beaten by three men and intended to kill them if he could find .them that night. Morris informed him that she and Stanford were reunited and asked him to give Stanford the apartment key. Defendant refused to give it to Stanford but did relinquish it to her. Stanford attempted to dissuade defendant from looking for the men who had beaten him. Morris recalled that Stanford, who had been drinking earlier, and defendant began drinking. Another couple came to the apartment, spoke briefly to defendant, and then left. Defendant then left to take his girlfriend home, returning in about 20 minutes with the knife still in his hand.

Stanford again told defendant not to go out looking for the men, but defendant replied that he was grown and did not need to be told anything. Morris asked defendant to leave, but he refused to do so without his coat, which Morris could not find. Morris went into her bedroom, leaving defendant with Stanford, who had indicated that he wished to remain and talk with the defendant. Morris denied that defendant and Stanford were arguing at this time. Ten to fifteen minutes later Morris heard Stanford say "Get back, man, get back off me, don't come no further." She came out to find Stanford on the floor and defendant, with a knife in his hand, saying "I stabbed him." Defendant then ran out. Morris awakened the man on the couch and ran next door for help.

On cross-examination Morris testified that Stanford was in the habit of carrying a knife but she did not know if he had one that evening.

James Foster, defendant's brother, testified that on that evening defendant came to his apartment and said that he should call somebody, that he had killed Tom.

Defendant was taken into custody the same evening outside the apartment building by Chicago Housing Authority security officers Glass and Cross. He was still carrying a knife in his hand when they arrested him. Later that evening defendant spoke to the two officers in the police interrogation room. Officer Glass testified that defendant just kept asking whether "he" was dead. Cross recalled defendant also asking "Did I really do it" and explaining that he was carrying a weapon because some men had attacked him.

Officer Kenneth Ross of the Chicago Police Department testified that after he informed defendant of his Miranda rights at the police station defendant said "Did I really kill him, is he going to be all right." Defendant also mentioned having been beaten up several days earlier.

Chicago police investigator Morris L. Sykes testified that no weapons were recovered from the scene of the stabbing. Later that evening he took

two oral statements from the defendant, after informing him of his rights, and listened to defendant make a third statement which was transcribed by a court reporter. Sykes read that third statement at trial. The first part of the statement was similar to Morris' account with the following pertinent differences and additions. Morris did not see the knife which defendant brought. Defendant's girlfriend left with the couple that came in after they did, Michael Ester and Ester's girlfriend. Stanford asked defendant for the key and told him to leave. Defendant said he would leave but first wanted to get a few possessions. As defendant began to leave Stanford "came up" to him. Defendant stabbed him with a knife he had been carrying in his waistband for several days. Samella Morris ran out of the bedroom saying that defendant had killed Stanford. Defendant did not know if Stanford had anything in his hands or whether Stanford struck him before being stabbed. Frightened, defendant ran to his mother's apartment where he found his brother and told him he had stabbed somebody. In the statement defendant also made the following comments:

> "I got no reason to lie. You ask me any questions you want, I tell you. All I know is that the man is known for cutting up people, and stabbing people, and I was not going to be taking no chances, period. I am going to be point blank. No more behind. I know what he is capable of, what he is capable of doing. Simple as that. My response was too, the first thing was to get him before he got me. That was my first response. Simple as that. What happened, I don't really know."

Sykes testified that in defendant's first statement to him defendant stated that Stanford walked toward him just before he stabbed him. Defendant explained that he carried a knife because he had been the victim of a battery, but that Stanford was not one of his attackers. Defendant also stated that he and Stanford had not been arguing and Stanford did not strike him before the stabbing. He also said that he was afraid of Stanford.

According to Sykes the second statement made by defendant to him was very similar to the first one. The only additional statement he recalled was that Stanford did not have a weapon in his hand when he walked toward the defendant.

It was stipulated that the pathologist who examined Stanford's body would testify that the cause of death was a stab wound to the chest which perforated the heart. It was also stipulated that the alcohol level in Stanford's blood was at a level which subsequent testimony by toxicologist Michael Shaffer established was over three times the amount necessary for a presumption of intoxication.

Defendant testified in his own behalf. For three months before the incident he`and Michael Ester had lived at Morris' apartment. Morris had given defendant a key so he could watch the apartment and he in turn made a key for Ester. At about 11 p.m. on September 5, 1977, defendant and his girlfriend came to the apartment. Subsequently Ester and a woman arrived, leaving five to 10 minutes later with defendant's girlfriend. Stanford did not like the fact that Ester had a key to the apartment and he discussed this with defendant. (Defendant explained at trial that his references to a key in his statements to the police concerned Ester's key.) Stanford "got to arguing" and told defendant to get his possessions and leave. Defendant attempted unsuccessfully to catch Ester and seek his aid in moving. Stanford became upset when defendant told him he could not catch Ester and he again began arguing with defendant. Stanford said something threatening to defendant which frightened him. He could not specifically recall what was said, but the tone was threatening and it was something about what Stanford would do to him. Defendant turned away from Stanford and Stanford came at him from behind, an action which defendant interpreted as an attack. Stanford was coming from the sink area where knives and spoons were kept and defendant did not know what he had, although he also testified that he did not see anything in Stanford's hands. Defendant took out his knife and stabbed Stanford. When he realized what he had done he ran to a neighboring apartment and asked the occupant to call an ambulance. He then ran to his mother's house where he told his brother what had occurred. Subsequently he was taken into custody by the security officers.

Defendant denied that Morris noticed the knife earlier that evening. He testified it was in his pocket with the handle covered by his shirt. He carried it because he had previously been attacked, although not by Stanford. Stanford had a bad reputation in the community for violence according to defendant. He also testified that Stanford was a violent person and he stabbed him because he knew Stanford would hurt him. Defendant admitted having several drinks earlier that day as well as a glass of beer and some wine at the apartment but he denied being drunk at the time of the incident.

The assistant state's attorney who elicited defendant's transcribed statement testified that defendant told him in a preliminary oral statement that he and Stanford "had words." In a memorandum of the conversation the attorney described this as an argument, but defendant had specifically told him that he did not have an argument with Stanford.

When defense counsel stated his intention to call certain witnesses to testify concerning Stanford's reputation, the State successfully made a

motion *in limine* to bar such testimony on the ground that there had been no evidence of self-defense or that Stanford was the aggressor.

## I.

The first claim of error we consider is the trial court's refusal to give the jury an instruction on self-defense. The court refused to give this instruction because it found that there was no evidence of self-defense. The statutory standard for when an affirmative defense such as self-defense is raised so as to require the State to disprove its existence beyond a reasonable doubt is that the defendant must present "some evidence" of the defense unless the State's evidence has raised the issue. Ill. Rev. Stat. 1977, ch. 38, par. 3—2.

Case law construing this standard is confused. There are many cases indicating that very slight evidence will raise the issue of an affirmative defense and thus require an instruction on it. (*People v. Leonard* (1980), 80 Ill. App. 3d 741, 400 N.E.2d 568; *People v. Cruz* (1978), 66 Ill. App. 3d 760, 384 N.E.2d 137; *People v. Looney* (1977), 46 Ill. App. 3d 404, 361 N.E.2d 18.) However, in *People v. Redmond* (1974), 59 Ill. 2d 328, 320 N.E.2d 321, the Illinois Supreme Court held that in order to raise the affirmative defense of insanity the evidence must raise a reasonable doubt as to that issue. In reaching that determination the court construed the "some evidence" language of section 3—2, thus apparently indicating that the standard would be applicable to all affirmative defenses. Yet in subsequent cases the court has applied less stringent standards in determining whether instructions on other affirmative defenses should have been given. *People v. Unger* (1977), 66 Ill. 2d 333, 362 N.E.2d 319 ("some evidence" sufficient to require instruction on defense of necessity); *People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31 ("very slight evidence" sufficient to require self-defense instruction).

But we need not determine which standard is applicable, for we find that even under the stricter standard utilized in *Redmond* the evidence in this cause was sufficient to require giving the instruction at defendant's request. (See *People v. Creach* (1979), 69 Ill. App. 3d 874, 387 N.E.2d 762, *appeal allowed.*) The jury was presented with the following testimony and evidence. Defendant knew Stanford had a bad reputation for violence; indeed, in his statement to the police he specified that Stanford had a reputation for "cutting up" people and stabbing them. Samella Morris also testified that Stanford was in the habit of carrying a knife, although she did not know if he had one the day he was stabbed. Defendant "had words" or argued with Stanford about leaving the apartment. When defendant turned to leave, Stanford, who was subsequently determined to be intoxicated, made threatening statements.

Defendant could not recall specifically what was said but he testified that it was something about what Stanford would do to him and he also recalled that the tone of the statements was threatening. While defendant's back was turned Stanford came toward defendant from the direction of the kitchen sink where knives were kept. Although defendant testified that he did not see anything in Stanford's hands, he also indicated that his back was turned when Stanford approached, and his action in stabbing Stanford was almost instantaneous. Finally, defendant indicated that he considered this to be an attack and was afraid of Stanford at the time.

■■ This summary is selective; we have not analyzed contradictions in defendant's testimony, nor need we determine whether the jury would have believed this testimony. What is of importance in this analysis is that this evidence, *if believed*, could have supported a finding that defendant had acted in self-defense. The evidence cited tends to establish not mere threats, as urged by the State, but an immediate advance toward the defendant following those threats by an intoxicated man whom the defendant knew to have been violent in the past. We find inapplicable those cases cited by the State in which, in affirming a conviction against a defense claim of reasonable doubt, this court has *inter alia* noted that the defendant was armed while the deceased was not. (*People v. Mosley* (1979), 68 Ill. App. 3d 721, 386 N.E.2d 545; *People v. Davis* (1975), 33 Ill. App. 3d 105, 337 N.E.2d 256.) In *Davis* and *Mosley* it was undisputed that the victim knew the defendant was armed. In this cause it was defendant's testimony that his weapon was concealed until the attack occurred. Furthermore, there is no requirement that the alleged attacker actually possess a weapon before self-defense can be asserted. (*People v. Kelly* (1975), 24 Ill. App. 3d 1018, 322 N.E.2d 527; *People v. Lockett* (1967), 85 Ill. App. 2d 410, 229 N.E.2d 386.) Because defendant was deprived of the opportunity to have the jury determine this issue, his conviction must be reversed. *People v. Farmer* (1977), 50 Ill. App. 3d 111, 365 N.E.2d 177.

■■ We also note that the manifest prejudice arising from the failure to instruct on self-defense extended beyond that issue. The jury was instructed on voluntary manslaughter in the form of Illinois Pattern Jury Instructions, Criminal, Nos. 7.05 and 7.06 (1968) (hereinafter IPI). These instructions informed them that if they found that defendant knowingly killed Stanford in the unreasonable belief that *circumstances existed* which justified that killing, they should find him to have committed voluntary manslaughter. But because the jury was not given IPI Criminal No. 24.06 on use of force in defense of person, the self-defense instruction to which defendant was entitled by the evidence, they were not informed of the nature of the circumstances contemplated in the voluntary

manslaughter instruction. Thus, defendant was also deprived of an adequately informed determination by the jury on this issue. See *People v. Woodward* (1979), 77 Ill. App. 3d 352, 395 N.E.2d 1203; *People v. Harris* (1976), 39 Ill. App. 3d 805, 350 N.E.2d 850.

## II.

The trial court's sole basis for barring defendant from presenting witnesses to testify concerning Stanford's reputation for violence was that defendant had presented no evidence of self-defense. Our determination that such evidence was presented establishes that the court erred in barring that testimony. However, even assuming, *arguendo*, that there was insufficient evidence of self-defense, we find that the testimony should have been permitted as relevant to the issue of voluntary manslaughter.

■■ Initially the State contends that defendant waived this issue by failing to present a formal offer of proof concerning the proposed testimony. But no formal offer of proof is needed if it is apparent that the trial court understood the nature of the objection and the character of the evidence or where the circumstances were sufficient to indicate the problem and the admissibility of the evidence. (*People v. Montgomery* (1977), 51 Ill. App. 3d 324, 366 N.E.2d 623.) It was clear at trial that the proposed testimony related to the victim's reputation in the community for violence and the only objection to the testimony was based on the alleged absence of evidence that the victim was the aggressor. Accordingly, we find that the absence of an offer of proof does not prevent our substantive consideration of the issue.

■■ The State relies on case law holding that evidence of the violent character of the victim was properly excluded if there was no evidence indicating the defendant acted in self-defense. (*People v. Allen* (1972), 50 Ill. 2d 280, 278 N.E.2d 762; *People v. Adams* (1962), 25 Ill. 2d 568, 185 N.E.2d 676.) But in none of those cases were the courts presented with the question of whether evidence tending to establish voluntary manslaughter based on an unreasonable belief in the right to self-defense would suffice to permit introduction of reputation testimony concerning the deceased. Under the facts of this cause we believe such testimony should have been permitted. In instructing the jury on voluntary manslaughter the trial court clearly found that there was some evidence that defendant believed he was being attacked. Part of the evidence tending to support this claim was defendant's testimony that the victim had a reputation for violence. Similar testimony by other defense witnesses could have sufficiently bolstered defendant's credibility on this issue so as to convince the jury that he did possess the belief that Stanford was about to injure him when he came toward him. Because this testimony would have been relevant to

the issues of self-defense and voluntary manslaughter the trial court erred in barring it.

### III.

Over defense objection the trial court gave to the jury IPI Criminal No. 3.07, which stated:

> "You have before you evidence that the defendant confessed that he committed the crime charged in the indictment. It is for you to determine whether the defendant confessed, and, if so, what weight should be given to the confession. In determining the weight to be given to a confession, you should consider all of the circumstances under which it was made."

The jury was also instructed that the defendant was charged with murder, so that they were in effect told that he had confessed to the crime of murder.

■■ A confession has been judicially defined as a comprehensive admission of guilt or of facts which necessarily and directly imply guilt. (*People v. Mireles* (1979), 79 Ill. App. 3d 173, 398 N.E.2d 150.) But where a statement also includes facts which tend to indicate the existence of a legal justification or excuse, that statement cannot be deemed a confession. (*People v. Weeks* (1976), 37 Ill. App. 3d 41, 344 N.E.2d 791; *People v. Sowell* (1965), 56 Ill. App. 2d 110, 205 N.E.2d 487.) In defendant's statements to the police he admitted stabbing Stanford, but also stated that Stanford was known for stabbing people, they had words, Stanford approached him from behind, he was afraid, and his reaction was to "get him before he got me." At a minimum these statements suggested that defendant's actions could have amounted to voluntary manslaughter rather than murder. Instructing the jury that defendant had confessed to murder may well have discouraged them from fairly evaluating the applicability of the lesser charge or even defendant's self-defense claim. (*People v. Sowell.*) Thus we conclude the trial court erred in giving this instruction.

### IV.

Finally, defendant cites two instances in which he contends the prosecution improperly commented on his post-arrest silence. In the first instance the prosecutor questioned security officer Glass when he was with the defendant at the police station:

> "Assistant State's Attorney: Now, was there any conversation at that time?
>
> Glass: After that gentleman there [defendant] came into the room he started talking to us, my partner and myself.
>
> Assistant State's Attorney: What if anything else did he say?

Glass: He was asking us did—was he dead, was he dead.

Assistant State's Attorney: And what if anything did you say?

Glass: I told him 'I don't know, as far as I know he might be.'

Assistant State's Attorney: And what if anything did he say next?

Glass: He didn't say anything, he just kept repeating over, 'Was he dead.' "

The second alleged instance of improper comment on post-arrest silence occurred during final argument by the prosecution. After recounting the statements defendant was alleged to have made to Samella Morris and to his brother about having stabbed Stanford, the prosecutor stated:

"After that you heard the testimony of the two security guards, the Chicago Police Officer, the Chicago Investigator and just this morning, the State's Attorney. Did he ever give any reason for the stabbing, any justification? No. That is why we called all those people, that is the reason that James Foster testified and all the other witnesses testified, because we showed you in the first three or four hours after this happened he talked to about seven or eight different people, some friends, one a member of his family, various people, officers, civilians, black and white, and he never chose to tell anybody one shred of justification for taking the life of Tom Stanford. And that is part of the evidence that you can consider in this case."

■■ Defendant did not object to these matters during trial nor did he raise them in his motion for a new trial. Although we could deem the issue waived on appeal on these bases (*People v. Pickett* (1976), 35 Ill. App. 3d 909, 342 N.E.2d 766; *People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817), we will consider it on the merits as a matter of fundamental fairness. *People v. Green* (1979), 74 Ill. 2d 444, 386 N.E.2d 272.

Initially, we find no merit in defendant's contention that the questioning of Officer Glass in itself constituted an attempt to bring before the jury defendant's post-arrest silence. Defendant apparently volunteered certain statements to CHA officers Glass and Cross at the police station. Glass only recalled one statement made by defendant, but subsequently Cross testified that defendant also made a statement about having been attacked on a previous occasion, thus explaining why he was carrying a knife. In this context the questioning of Glass as to whether defendant made any other statements was clearly an attempt to elicit all the statements he made at that time.

■■ But in final argument to the jury the prosecutor chose to utilize this testimony in a different manner. The prosecutor pointed out to the jury that in defendant's first statements after the stabbing, statements made to Samella Morris, defendant's brother, the CHA officers, and Chicago police officer Ross, defendant admitted stabbing Stanford but did not

provide any justification for that act. This was clearly an attempt to impeach defendant's subsequent claims, made under police questioning several hours later and again at trial, that he acted because he believed he was being attacked by Stanford.

■■ It is a violation of due process to impeach a defendant who offers an exculpatory story at trial with his failure to offer that statement to police following his arrest. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.) This holding is applicable even where there is no evidence that the defendant was previously given his Miranda warnings. (*People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857.) However, there are two circumstances in which the prosecution may permissibly comment on post-arrest silence. If the defendant at trial claims falsely that he also gave his exculpatory statement to the police when arrested he may be impeached with evidence that he did not in fact do so. (*Doyle v. Ohio*; see *People v. Rehbein* (1978), 74 Ill. 2d 435, 386 N.E.2d 39, *cert. denied* (1979), 442 U.S. 919, 61 L. Ed. 2d 287, 99 S. Ct. 2843.) And if defendant's exculpatory statement at trial is manifestly inconsistent with statements he made after his arrest, *in the context of eliciting that contradiction*, comment or questioning about his failure to give the same statement at that time is not improper. *Rehbein; People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857.

Neither circumstance can be found in this cause. There was no claim made that defendant gave an exculpatory statement immediately following his arrest; that statement came several hours after his arrest. Nor was there any manifest contradiction between defendant's initial limited statements about having stabbed or killed Stanford and his subsequent explanation of his actions. For these reasons the prosecutor's attempt to suggest to the jury that defendant's initial statements to the security officers and the police were impeaching constituted a *Doyle* violation.

For the foregoing reasons, defendant's conviction is reversed and the cause remanded for a new trial.

Reversed and remanded.

LINN, P. J., and JIGANTI, J., concur.