THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RICKY McGEE, Defendant-Appellant.

Second District   No. 81—116

Opinion filed November 22, 1982.—Rehearing denied January 4, 1983.

G. Joseph Weller and John R. Wimmer, both of State Appellate Defender's Office, of Elgin, for appellant.

Daniel D. Doyle, State's Attorney, of Rockford (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:
Defendant Ricky McGee was convicted, after trial by jury in Winnebago County, of murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)). The information filed alleged that defendant had, with the intent to kill or do bodily harm, killed Thomas L. Barnes without lawful justification by shooting him with a gun. After the jury's verdict was returned defendant was sentenced to 35 years with the Department of Corrections.
Defendant raises three issues on appeal. His first contention is

that he should have been allowed to give the jury a self-defense instruction. He contends there was sufficient evidence of self-defense adduced at trial to warrant such an instruction. His second contention also challenges the jury instructions, alleging it is error to not give an instruction which would have required the State to prove that defendant was not acting under sudden and intense passion resulting from serious provocation by the victim. Defendant's final contention is that he was denied a fair trial because the prosecutor made an improper closing argument.

On August 25, 1980, Thomas L. Barnes was shot and killed behind the West End Tap in Rockford. The State presented three witnesses that had been at the scene of the crime. All were patrons of the bar. The State's principal witness, James Finch, was an eyewitness to the murder. Two women who testified had been in the West End Tap at the time of the shooting. Additionally, there was testimony from the doctor who performed the autopsy on the victim. Certain police officers testified that they had reported to the scene of the crime.

The defense presented the testimony of a patron of the bar, William Allen, and the testimony of an investigating police officer.

Testimony of the State's key witness, James Finch, was as follows: Finch had been living with Barnes and had spent the afternoon with him after Barnes got off work. He testified that Barnes, the victim, was his brother-in-law. After he and Barnes went to look at a car that Barnes wanted to purchase, they went to the West End Tap. While sitting at the bar Finch borrowed some money from Barnes and bought a pack of Salem 100's. He opened them, took one, and set them on the bar next to where he was sitting. Later, when he looked for them they were gone. Both Finch and one of the women patrons at the bar who testified indicated that the defendant had come into the bar and had been standing next to Finch. When Finch realized the cigarettes were missing he and Barnes went to the front of the bar where defendant was and asked him for the cigarettes. Although Finch saw a pack of Salem's in defendant's pocket, defendant denied having Finch's cigarettes.

Defendant, Barnes and Finch then went out the front door and Finch again asked defendant for his cigarettes. Finch testified that Barnes told defendant to "give up the cigarettes." Defendant took a package of Salem's from his pocket, stating, "Here, brother, here goes your cigarettes." Finch responded by saying, "That's not a brother, taking my cigarettes."

After this confrontation Finch and Barnes went back inside the

tavern and ordered another beer. Three or four minutes later defendant came back in the bar with a .25-caliber automatic in his hand, approached Barnes and Finch and told them to "come outside." First, the three or four people who had entered the bar with defendant went out, then the defendant and then Finch. Finch told defendant that if he "wanted to take my life over a package of cigarettes, go ahead." Defendant did not respond to Finch's statement. At this point Barnes walked to the back door and defendant addressed him, saying, "Nigger, you is the one who shoved me." Defendant fired the gun over Finch's left shoulder and Barnes was hit. Barnes staggered, went back in the tavern and made his way out the front door. Barnes was bleeding from the nose and mouth and Finch laid him on the sidewalk. Barnes later died from the gunshot wound.

On cross-examination Finch reiterated his testimony that he saw defendant re-enter the tavern with a gun in his hand. Defense counsel then read from the record of the preliminary hearing where Finch was asked: "When was the first time that you saw that gun in his hand?" Finch answered: "Out back."

Finch then stated that when he said "Out back" he was referring to the back door.

Finch's version of what occurred at the West End Tap is similar to that of two other patrons of the tavern who testified, Marilyn Fields and Linda Malone. Both women had been sitting with Barnes in the tavern prior to the shooting, and Barnes had purchased a beer for them. Fields saw defendant enter the tavern and stand near Barnes at the bar. After about five minutes defendant left; Finch and Barnes followed him out the front door. After a minute or two, she stated, Finch and Barnes came back into the tavern. Two or three minutes passed and defendant re-entered, this time with five men accompanying him. Defendant walked to the back where Fields and the others were sitting and said that he wasn't going to take nobody pushing him. Fields testified that defendant had a gun in his right hand when he entered the tavern.

Both Fields and Malone testified that Barnes, Finch, the defendant and the men that had come into the tavern with defendant all went out the back door. Fields went to the back door and could hear the men arguing. She saw defendant waving his gun in the air. Barnes started to come back into the tavern, then went back to the door. Fields then heard a "pop" that sounded like a pistol. Barnes came running into the bar bleeding from the mouth. He ran through the tavern and collapsed on the sidewalk in front.

The doctor who performed the autopsy on Barnes, and a police of-

ficer who recovered a shell casing from the alley, also testified.

For the defense, Detective Roger Anderson testified and indicated that he had inventoried two pocket knives and a ruler from Barnes' clothing.

The final witness for the defense was William Allen. His testimony varied widely from that described above. Allen's testimony is discussed below, together with defendant's first contention on appeal.

In rebuttal, the State sought to call two Rockford detectives to testify about a statement defendant gave the morning after the murder. The defendant objected and the State, as an offer of proof, summarized their testimony. The detectives had received a call that the defendant was at the police safety building on the morning after the crime. They went to the building and arrested defendant, who told them that he had come to turn himself in so that he could tell his side of the story.

After *Miranda* warnings, defendant made a statement. He said that he had gone into the tavern to buy cigarettes, Salem 100's, and he got into an argument with Barnes and Finch. They argued outside the tavern about the cigarettes. After they returned inside defendant was struck from behind and knocked to the ground. He then heard shots and took off running. He did not have a gun nor did he see one. After this, the detectives testified in conformity with the offer of proof.

After deliberations the jury returned a verdict of guilty of the murder charge.

Defendant's first contention on appeal is that the trial court erred by refusing his jury instructions on self-defense. He contends that the testimony of defense witness, William Allen, was sufficient evidence so that the jury may have concluded that defendant, in response to threats from the victim, shot in self-defense.

At trial William Allen testified as follows: He had been sitting across from Marilyn Fields in front of the West End Tavern on the evening in question. Allen did not know Barnes, Barnes' brother-in-law Finch, or defendant before that evening. He testified that he saw Barnes enter the tavern. He had a few beers and then noticed defendant enter the tavern through the front door, alone. Defendant walked up to the bar in the back where Barnes was sitting. Allen did not hear or see anything happen between Barnes and defendant until he noticed the two men go out the front door. Then, Allen and the man he had been sitting with went outside the front of the tavern. Allen testified that "Barnes had pulled a knife towards Mr. McGee" and he heard Barnes tell defendant McGee, "If you want anything from me,

ask me for it." On cross-examination Allen said what he saw was a carpenter's knife, with an inch and half hook blade. He indicated this is the type of knife used for cutting linoleum. Defendant then left and Allen returned to his table inside the tavern. Allen testified that 15 or 20 minutes later he noticed defendant come back in the front door and walk to the back of the bar where Barnes was playing pool. Allen did not notice if defendant had anything in his hand. After talking, defendant's friends went out the back door, then Barnes, and then defendant. The next time Allen saw Barnes, Barnes had come back in the back door and said, "Somebody help me." Barnes then walked out the front door and fell to the ground.

On cross-examination, the State inquired about a statement that Allen had given to the police the morning after the murder. Allen was asked why he had told the officer he saw Barnes pull a hook blade knife and then go out the front, rather than the back door. Allen indicated that it was his mistake, but he was telling it "[t]he way it happened." Allen's first statement did not mention anything about his having gone outside and seeing Barnes push defendant up against the wall. Allen also indicated that neither of the knives recovered from the victim's clothing, which were admitted as exhibits, was the one he saw Barnes pull out.

Allen's testimony, together with that of Detective Anderson's regarding the two pocket knives recovered from Barnes' clothing, was the sum of evidence adduced by defendant. Defendant contends this was sufficient evidence to support a claim of self-defense and that the jury should have been so instructed.

The jury instruction which defendant sought to have tendered was entitled "Use of Force in Defense of a Person," and provides:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend [himself] [another] against the imminent use of unlawful force.

> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent [imminent death or great bodily harm to (himself-another)] or [the commission of a forcible felony]." Illinois Pattern Jury Instructions, Criminal, No. 24.06 (1968) (hereinafter IPI Criminal). See also Ill. Rev. Stat. 1979, ch. 38, par. 7—1.

After argument, defendant's request that the above instruction be given to the jury was denied. In so ruling, the court noted that it found no evidence of self-defense. The court did allow the definitional

and issues instructions on voluntary manslaughter to be given. (IPI Criminal Nos. 7.03 and 7.04.) These instructions are based on sudden and intense passion resulting from serious provocation.

After reviewing the record in this case and the pertinent cases we have determined that the trial court was correct in its determination that no self-defense instruction be given to the jury.

As defendant points out, it is well settled that a self-defense instruction should be given when there is some evidence in the record which, if believed by a jury, would support a claim of self-defense. (*People v. Lockett* (1980), 82 Ill. 2d 546, 551, 413 N.E.2d 378.) In *Lockett*, which was filed November 18, 1980, the day before the instructions conference in the case at bar, the court stated that both the self-defense and voluntary manslaughter instructions should be given when *any evidence* is presented showing the defendant's subjective belief that the use of force was necessary. If that subjective belief is reasonable, the result is justifiable use of force; if the subjective belief is unreasonable, the result is voluntary manslaughter. (82 Ill. 2d 546, 552, citing *People v. Joyner* (1972), 50 Ill. 2d 302, 306-07, 278 N.E.2d 756.) In *Lockett* neither the voluntary manslaughter nor self-defense instructions were tendered and defendant was granted a new trial. As indicated above, in the case at bar the defendant did receive a voluntary manslaughter instruction.

Therefore, in light of *People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378, the issue is whether there was any evidence presented that the defendant had a subjective belief that force was necessary. The judge is not to decide if that belief is reasonable or not. In *Lockett* the evidence showed that defendant was driving with some friends, and they came upon the victim, whose pushcart was blocking a lane of the street. The victim, standing by the passenger's side of the car reached into his cart and brought out something brown. Defendant testified that he fired at the victim when the victim started to approach him with a gun. Police found no other weapons at the scene, but did find an empty whiskey bottle, brown in color, at the scene. Based on this factual situation the court determined that defendant was entitled to both a manslaughter and self-defense instruction.

We believe that *People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378, presented a situation quite different from the case at bar. While there was some evidence in both cases that the victim and the defendant were arguing, there was no evidence in the case before us that defendant's use of his weapon was "necessary to defend [himself] [another] against the imminent use of unlawful force" or "necessary

to prevent [imminent death or great bodily harm to (himself-another)] ***." (IPI Criminal No. 24.06.) The only evidence shown that defendant had been threatened came from Charles Allen, who indicated that Barnes had threatened the defendant 15 to 20 minutes before he returned to the tavern with the gun. From this evidence the jury could have deduced that Barnes was a violent person, but they could not have viewed this as a situation requiring the use of force to protect oneself. We do not believe *Lockett* can be interpreted so broadly as to be applicable to the case before us..

Another pertinent case in this area is *People v. Foster* (1980), 81 Ill. App. 3d 915, 401 N.E.2d 1221, where the defendant was convicted of murder and on appeal urged that it was error for him not to have been allowed a jury instruction on self-defense. Defendant himself testified in *Foster* that the victim had said something to him and that the tone of the statement made was threatening. Defendant testified that his back was turned to the victim when the victim approached, that he did not see anything in the victim's hands and that his action in stabbing the victim was almost instantaneous. Further, he indicated he considered the approach of the victim to be an attack and he was afraid of the victim at that time.

Based on this summary of the facts, the court in *People v. Foster* (1980), 81 Ill. App. 3d 915, 401 N.E.2d 1221, stated that there was sufficient evidence, if believed, to support a finding that defendant had acted in self-defense. The court went on to say "[t]he evidence cited tends to establish not mere threats, as urged by the State, but an *immediate advance toward the defendant* following those threats by an intoxicated man whom defendant knew to have been violent in the past." (Emphasis added.) (81 Ill. App. 3d 915, 922.) Again, the situation in the case at bar lacks an imminent threat that the *Foster* court noted.

Even prior to *People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378, both self-defense and voluntary manslaughter jury instructions were viewed as companion instructions. (*People v. Woodward* (1979), 77 Ill. App. 3d 352, 395 N.E.2d 1203.) *Woodward* was similar to the case at bar in that the voluntary manslaughter instructions were given but the self-defense instruction was not allowed to go to the jury. The court in *Woodward* stated as follows:

> "In *People v. Harris* (1976), 39 Ill. App. 3d 805, 811, the court held that it was 'difficult to conceive of a situation where there would be evidence of a belief that deadly force was justified but where the evidence would be such that the issue of the reasonableness of that belief should not be submitted to the

jury, and such a situation does not appear to have been contemplated by the drafters of IPI Criminal.' The *Harris* court thus suggested that whenever a voluntary manslaughter instruction, based on an 'imperfect' defense of self-defense, is given in a murder case, an instruction on the 'perfect' defense of self-defense should also be given. We find the reasoning in *Harris* persuasive." (*People v. Woodward* (1979), 77 Ill. App. 3d 352, 356-57, 395 N.E.2d 1203, 1207.)

The *Woodward* court went on to note that the self-defense instruction would be proper only if the defendant produced "some evidence" of a reasonable belief of the necessity for the use of deadly force. Though not raised by the parties in the case at bar, this leads to a question of whether or not the manslaughter instruction should have been tendered to the jury. We think not.

Some guidance in this area is provided by a case not cited by the parties, *People v. Toth* (1982), 106 Ill. App. 3d 27, 30, 435 N.E.2d 748. The *Toth* court discussed when self-defense instructions should be given and stated that self-defense and voluntary manslaughter, based on a reasonable belief of justification, are two sides of the same coin. In *Toth* the defendant had stated that he got into an argument with the victim, who, he contended, wanted to seduce him. She hit him with a paintbrush and pulled a serrated steak knife from her pocket. Defendant grabbed the knife from her and struck her a few times. The victim started bleeding and said that she was "bleeding to death." The defendant carried her to a nearby pond and tossed her face down into the water, not knowing whether she was alive or dead. It was later determined that the victim died from drowning. Defendant stated he did not know how many times he had stabbed her and that it was "either me or her."

On appeal it was held that the submitted instructions on voluntary manslaughter did not find support in the record. The court stated

" 'The testimony falls far short of the reasonable, adequate provocation required to reduce murder to manslaughter while in the heat of passion. The test is objective, not subjective. The inquiry is not as to whether the defendant was angry at someone or about something at the time he \*\*\* killed the deceased. The question to be asked is whether there existed such provocation as would have caused the state of mind claimed in an ordinary person under the same circumstances.' *People v. Matthews* (1974), 21 Ill. App. 3d 249, 252, 314 N.E.2d 15, 18, *appeal denied* (1974), 57 Ill. 2d 605." *People v. Toth* (1982), 106 Ill. App. 3d 27, 31-32, 435 N.E.2d 748.

Applying the objective test, the court noted that an ordinary person under these circumstances would not have concluded "it was me or her." Therefore, it found that there was not sufficient provocation for the murder charge to be reduced to voluntary manslaughter by reason of sudden and intense passion. The court in *Toth* noted that the sequence of events should be reviewed. In the defendant's altercation with the victim his conclusion that it was "me or her" happened first. At the time when they were at the edge of the pond and the victim apparently passed out, she was not a threat to the defendant and defendant could not have thought, at that point, that it was "either me or her." Therefore, the court stated, his actions in throwing her into the pond, a situation from which she was unable to extricate herself, could not have been self-defense. Therefore, it held there was no evidence of circumstances that would create the belief that throwing the victim into the pond was necessary to prevent defendant from suffering imminent death or great bodily harm. (*People v. Cannon* (1971), 49 Ill. 2d 162, 166, 273 N.E.2d 829, 831.) The appellate court noted that it was harmless error for the self-defense instruction to have been submitted to the jury. Further it noted that it was correct for the trial court to have refused the instructions on voluntary manslaughter through unreasonable belief in justification.

*People v. Toth* (1982), 106 Ill. App. 3d 27, 435 N.E.2d 748, is similar in one very important regard to the case at bar. In both cases there was a lack of evidence that at the time when defendant committed the act which resulted in the victim's death, he was under a threat of imminent death or great bodily harm. Absent any evidence of such threat the defendant is not entitled to either a self-defense or voluntary manslaughter instruction.

In light of the cases discussed above and our review of the evidence in this cause, we believe the trial court properly denied defendant's request for a self-defense instruction.

■ The evidence in the case at bar reveals that there may have been a threat by the victim towards defendant. William Allen testified that he saw the victim pull a knife toward defendant and tell him that if he wanted anything to ask for it. Allen said that the victim returned inside after this and had at least one beer, or was shooting pool when, 15 or 20 minutes later, defendant returned with a pistol. There was no evidence that the victim presented any threat to defendant at the time of the shooting. Nor does the testimony from Marilyn Fields, that the men outside the bar were arguing prior to the shooting, support a self-defense claim. For these reasons we believe that the trial court properly refused defendant's request for self-

defense jury instructions.

■ Defendant's second contention on appeal also concerns the jury instructions. He contends that he was deprived of a proper jury determination of the extent of his criminal liability because the trial court failed to include, in the issues instruction on murder, the requirement that the State prove that he was not acting under sudden and intense passion resulting from serious provocation by the victim, Thomas Barnes.

However, the record reveals that at trial, defense counsel had no objection to these instructions. He concedes that this was waived at trial and in his post-trial motion. In *People v. Smith* (1978), 71 Ill. 2d 95, 104, 374 N.E.2d 472, it was stated: "We recognize that it is the obligation of defendant to object to a particular instruction. [Citation.] So also, it is his duty to tender a proper instruction on a particular issue at trial. [Citation.]" Like counsel in *Smith*, defendant here relies on Supreme Court Rule 615(a) to the effect that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." (87 Ill. 2d R. 615(a).) There is some question whether Rule 451(c) that "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require" (87 Ill. 2d R. 451(c)) might not be more relevant.

Whichever rule is applied, it has been held that the trial court is not required to instruct the jury that the State must negate the elements of voluntary manslaughter beyond a reasonable doubt before a jury can convict someone of murder. (*People v. March* (1981), 95 Ill. App. 3d 46, 56, 419 N.E.2d 1212.) We see no plain error.

Defendant's reliance on *People v. Stuller* (1979), 71 Ill. App. 3d 118, 389 N.E.2d 593, is misplaced. *Stuller* was concerned with inconsistent verdicts, and the jury had returned a verdict of guilty on both the manslaughter and the murder charge, unlike the case at bar where the verdict was guilty of murder alone. In *People v. Perez* (1981), 100 Ill. App. 3d 901, 908, 427 N.E.2d 229, a situation similar to the one in issue arose, and the court held that where the jury has rejected a voluntary manslaughter charge, an omission in the murder instruction did not give rise to plain error. We reach the same result here.

■ Defendant's final contention on appeal is that reversible error occurred in the arguments made by the prosecutor. He contends that on two separate occasions the prosecutor gave his opinions concerning defendant's guilt to the jury. In his opening statement he stated: "You know, charging someone with the offense of murder is not something

that you do lightly." In his closing argument he repeated this point, saying, "I told you in the beginning, ladies and gentlemen, the charge is murder, it is not something that is placed as a charge lightly or proven by speculation." While it is well settled that it is improper for the prosecutor to give his own opinion on defendant's guilt to the jury (*People v. Hopkins* (1970), 124 Ill. App. 2d 415, 259 N.E.2d 577), it is not clear that these statements are real indications of the prosecutor's opinion regarding the guilt of the defendant. Because defendant did not object to these comments nor preserve them in his post-trial motion, we can consider these errors only under the plain error doctrine of Supreme Court Rule 615(a) (87 Ill. 2d R. 615(a)).

When read in context, the comment regarding charging someone with murder is part of an explanation by the prosecutor that does not indicate the prosecutor's personal belief of anything other than the seriousness of the crime of murder. Similarly, it could be seen in the closing argument comment that the prosecutor was commenting on or giving his opinion as to what was shown by the evidence. This is not error if the evidence supports the argument. *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.

The comments made that are contended to be erroneous in this case are far less damaging than those which have been seen as improper in other cases. For example in *People v. Fuerback* (1966), 66 Ill. App. 2d 452, 214 N.E.2d 330, the prosecuting attorney replied to defendant's closing argument by saying that he thought that if the prosecuting attorney had not thought that the defendant was guilty, he would have dismissed the case. Because there was no evidence upon which that opinion could be based the court found this question to be improper and to constitute prejudicial error. See also *People v. Hopkins* (1970), 124 Ill. App. 2d 415, 418, 259 N.E.2d 577.

Defendant also contends that the prosecutor made a prejudicial remark when he stated that "what we are looking at here is the feeling of almost being in a game show. We are going to have defense No. 1 or defense No. 2 or defense No. 3, take your pick." This statement was objected to by defendant and the court overruled the objection. Defendant contends that the prosecutor was attempting to penalize the defendant for holding the State to its burden of proof on all elements of defense.

Defendant relies upon the case of *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 1072, 405 N.E.2d 1306, which concerned a prosecutor who had argued, in closing argument, that defendant had phoned his attorney the morning after the murder. This was claimed to be a constitutional error in that the prosecutor's comment infringed on a

constitutional privilege that defendant sought to exercise, that of the exercise of the right to counsel. However comments made in closing argument about defendant's exercising his right to counsel the morning after the murder are far more damaging than a comment that defendant is exercising different defenses at trial.

We do not believe that the prosecutor's arguments were intended to or had the effect of lessening the State's burden of proof on this case. While the comments quoted above were possibly improper, it does not appear that they were so improper as to be prejudicial or to constitute plain error.

For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

VAN DEUSEN and LINDBERG, JJ., concur.