THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HELEN DOWDY, Defendant-Appellant.

(No. 58351;

First District (1st Division)—August 5, 1974.

Paul Bradley and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (James S. Veldman and Alan W. Brothers, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HALLETT delivered the opinion of the court:

The defendant was found guilty of murder (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a)(2)) and was sentenced to a term of 40 to 100 years. She appeals and raises the following issues: (1) whether the trial court erred in denying her motion for a substitution of judges; (2) whether the trial court erred when it refused to submit to the jury her tendered instructions on voluntary manslaughter and self-defense; (3) whether the trial court erred in finding that she was proven guilty beyond a reasonable doubt; (4) whether she was denied a fair trial by the introduction of allegedly irrelevant and prejudicial testimony; and (5) whether the sentence she received was excessive. We conclude that the court should have submitted the instructions tendered on self-defense and therefore reverse and remand without reaching the other questions presented.

On December 30, 1970, the grand jury returned an indictment charging the defendant with the murder of Joseph Martin. She entered a plea of not guilty and the case was assigned to Judge Wilson. Her motion for a substitution of judges (Ill. Rev. Stat. 1969, ch. 38, par. 114—5(c)) was denied after a hearing.

The following witnesses testified at her jury trial. Mrs. Lela Johnson and Mrs. Irene Smith testified for the State. Both stated that they were employed by the AmVets store located at 715 East 47th Street. On October 1, 1970, both were alone in the front portion of the store near the register. At approximately 3:30 P.M., Joseph Martin, the deceased, entered the store and began talking to Mrs. Smith who was standing behind the counter. Mrs. Johnson was standing behind her. Mr. Martin was standing in front of the counter. The women talked with him for approximately 20 minutes. Lighting conditions in the store were very good—the store had fluorescent lights and it was still light outside. Both women testified that at approximately 3:45 P.M. the defendant accompanied by two boys walked into the store and asked for the security guard. After Mrs. Johnson told her that he was not there, the defendant replied that "some  *  *  *  with hair on his face called the police on her." Mrs. Johnson replied that she did not know what the defendant was talking about. The defendant then turned to Mr. Martin, who had

said nothing, and said, "You got hair on your face, * * * I am going to kill you." Martin answered, "Ma'am, I don't even know you." The defendant then grabbed a purse from one of the boys behind her and pulled out a gun. As the defendant waved the gun around, Mrs. Johnson backed up a few feet, but Mrs. Smith remained at the register. Although Mrs. Johnson backed up, she stated that she never turned her back on the scene. At this point the defendant was about one foot from Mr. Martin. She then lowered the gun and fired a shot hitting Martin in the leg. Martin went behind the counter and knelt down. Defendant then leaned over the counter and shot him a second time—in the neck. She then turned and ran out of the store leaving him lying in a pool of blood behind the counter. Both Mrs. Johnson and Mrs. Smith testified that they had a clear view of the incident and that no one else had a gun.

Mrs. Johnson called the police. She and some other individuals used blankets and rags to stop the bleeding. They also went outside to get some dirt to put on the wounds because someone had told them that dirt would stop the bleeding. Martin was subsequently taken to Provident Hospital by squad car. Later he was transferred to County Hospital where he stayed about a week. The bullet in his neck was not removed. Following his release from the hospital, his neck and leg became swollen. He was readmitted to County Hospital on November 8, 1970, and died there on November 19, 1970.

Dr. Kearns, a pathologist for the Coroner of Cook County, testified for the State. His specialty is the study of the cause and effect of external violence such as bullet wounds. He performed a pathological examination on the deceased on November 19, 1970, and found marked swelling, especially in the chest and neck. He removed a bullet from the neck. He testified that the swelling had been caused by infection which had developed from the bullet wound. Although he could not give an exact opinion as to whether the bullet should have been removed earlier during treatment of the deceased, he did say that special surgery would have been required to remove it. He also stated that in his opinion decedent's death "resulted from the shock and hemorrhaging caused by the bullet wound in the neck."

Defendant was arrested on the morning following the shooting when Mrs. Johnson and Mrs. Smith recognized her walking down the street across from the store and promptly summoned a police officer.

Defendant testified that early in the morning of the shooting she went out to borrow some money to pay for her daughter's hearing aid. She said she met the deceased in a bar and drank with him for 3 or 4 hours. She did not know him but had seen him before on several occasions. After telling him of her problem, he told her he would help her and

gave her $25. Following this conversation, they went to a hotel and had sexual intercourse several times. Some time later they emerged from the hotel. At his insistence, she returned the money to him in turn for his promise to return later with more money. She waited for him, but he did not return. She stated that she proceeded to look for him and finally found him outside the AmVets store. They argued and he struck her knocking her against a car fender. He then turned and walked into the store. About 15 minutes later, she followed him. The argument continued and when he drew back his fist she pulled a gun out of her purse and shot toward the floor intending only to scare him. He grabbed her arm causing the gun to fire again. At this point she claimed that the security guard entered the store and grabbed her. Together they ran out of the store. He then took her to an empty building where she hid until dark. Later that night, she met him in a tavern and they had a few drinks. The next day she was arrested across the street from the store while on her way to pick up a television set.

On cross-examination she admitted lying under oath at the inquest into the death of the deceased where she had told a story substantially different from the one she told at trial. She claimed that she was upset during the inquest.

The security guard was called by the State in rebuttal. He denied having been in the store on the afternoon of the shooting and denied having seen the defendant during the month of October.

Defendant submitted instructions on voluntary manslaughter and self-defense but the judge refused to give them to the jury. The jury found the defendant guilty of murder and she was sentenced to a term of 40 to 100 years. This appeal followed.

Passing directly to the defendant's contention that the trial court committed reversible error in refusing to submit to the jury her tendered instruction on self-defense, it is, of course, well settled that a refusal to give such an instruction is not error where there is no evidence to support such a theory (*People v. Dukes* (1960), 19 Ill.2d 532, 539, 169 N.E.2d 84, *cert. denied*, 365 U.S. 830, 5 L.Ed. 2d 707, 81 S.Ct. 716) but it is equally well settled that the jury should be instructed on any theory of defense if there is believable evidence to support it. *People v. Scalisi* (1926), 324 Ill. 131, 145, 154 N.E.2d 715.

■■ The defendant testified that when she first cursed the deceased outside the store, he struck her "upside the head" and knocked her against a car fender. After she had followed him into the store and asked why he had cheated her, he turned around and "drawed [*sic*] back his fist at [her]." She "thought he was going to hit [her] again" so she took a gun from her purse and shot it at the floor. The deceased

grabbed her arm and the gun went off again. The controlling question then becomes: Could a fact-finder conclude that she reasonably believed that she was in danger of suffering great bodily harm when she took out the gun and fired it?

The term "great bodily harm" appears in our aggravated battery statute (Ill. Rev. Stat. 1969, ch. 38, par. 12—4) and it has repeatedly been held that what constitutes great bodily harm under that statute is a question of fact. (*People v. Hunter* (1973), 14 Ill.App.3d 879, 887, 303 N.E.2d 482; and cases there cited.) Analogously, "great bodily harm," as used in our self-defense statute (Ill. Rev. Stat. 1969, ch. 38, par. 7—1), is also a question of fact. The precise wording of our statute is that a person is

> "justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

One might suspect that a mere assault with the fists would not justify the use of a deadly weapon but as long ago as 1878 that proposition was rejected by our supreme court in *Davis v. People* (1878), 88 Ill. 350, 351, where the following instruction was given:

> " '6. Although the deceased may have menaced and threatened to assault, and did strike the defendant with his hand or fists, the defendant was not justified in resorting to a deadly weapon, if it has been proved he did resort to such weapon, and using it in such a manner as to produce death. Before a person can be justified in resorting to a deadly weapon, and using it in a deadly manner, it must appear that he was in imminent peril of death or great bodily harm, or that a reasonable man, under like circumstances, would have reasonable grounds to believe that he was in peril of losing his life or sustaining great bodily harm, and that he could not otherwise reasonably have saved his life, or his person from great bodily harm!"

In reversing a manslaughter conviction, the court, at pages 351-352, said:

> "There was error in giving the first clause of this instruction. It is absolute in form, in no way qualified by any reference to the last clause. It virtually declares that, under the circumstances of the assault which was here made upon the defendant, he was not justified in resorting to the use of a deadly weapon.
>
> It takes from the jury all consideration of whether the defendant was in imminent peril of receiving great bodily harm, or

had reasonable ground to so believe, and that the use of a deadly weapon in the manner stated was necessary to prevent his receiving great bodily harm, and the court itself decides this question of fact for the jury in the negative, by telling them that an attack with the fists did not justify the use of a deadly weapon in such a manner as to produce death. That is not to be affirmed as matter of law. And certainly it can not be asserted that the evidence was not sufficient to raise a fair question upon the subject for the consideration of the jury."

■■ While it is true that two apparently disinterested witnesses testified for the State that the defendant not only threatened to kill Martin but deliberately shot him twice, the second time when he was on the floor behind a counter which she had to lean over to shoot him, and that a jury very likely might not accept her diametrically opposed version, her credibility is for the jury and can only be resolved by it, not by the court.

■■ We therefore reverse the judgment and remand the cause for another trial.

When and if she is tried again, we are of the opinion that her attorney should submit (and the court should give) an instruction and manslaughter verdict based on section 9—2(b) (Ill. Rev. Stat. 1969, ch. 38, par. 9—2(b)), which provides in substance that one who kills under an unreasonable belief that he is in danger of losing his life or suffering great bodily harm is guilty of voluntary manslaughter. A jury in this case could have so found.

■■ As the case was tried, the instruction and manslaughter verdict actually tendered were based on section 9—2(a) relating to sudden and intense passion arising from serious provocation, which theory was not supported by the evidence. We do not mean to suggest that the trial court was obliged to submit *sua sponte* such forms (*People v. Meeks* (1973), 11 Ill.App.3d 973, 981, 297 N.E.2d 705), but we do suggest that, on the new trial, her counsel do so.

Reversed and remanded.

EGAN, P. J., and BURKE, J., concur.