THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GARY HARRIS, Defendant-Appellant.

Fourth District   No. 13123

Opinion filed July 1, 1976.

Richard J. Wilson and Daniel D. Yuhas, both of State Appellate Defender's Office, of Springfield, for appellant.

Basil G. Greanias, State's Attorney, of Decatur (James P. Brinkoetter, Jr., Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE GREEN delivered the opinion of the court:

Following a jury trial in the Circuit Court of Macon County defendant Gary Harris was found guilty of murder and sentenced to imprisonment for a term of 20 to 60 years. On appeal defendant contends that the trial court erred in (1) refusing to submit an instruction on self-defense to the jury, and (2) denying his motion to suppress oral statements he made to police officers.

■■ We first consider defendant's contention that a self-defense instruction should have been given. It is well settled that a defendant is entitled to have the jury consider any legally recognized defense which has some foundation in the evidence and that "very slight" evidence on a given defense entitles defendant to an instruction on that defense. (*People v. Bratcher*, 63 Ill. 2d 534, 540; *People v. Kucala*, 7 Ill. App. 3d 1029, 1035, 288 N.E.2d 622, 626; see also *United States v. Grimes* (7th Cir. 1969), 413 F.2d 1376, 1378.) In considering whether there was evidence to require the giving of a self-defense instruction in the instant case it is necessary to review the facts presented at trial.

Certain facts are undisputed. At approximately 4 on the afternoon of May 9, 1974, John Lewis Rice was fatally shot by defendant at Rice's apartment in Decatur, Illinois. About a week prior to the shooting, defendant's girl friend Gussie Lee, who had been living with defendant for two years, left him and moved in with deceased. The night before the shooting, defendant went to deceased's apartment, was refused admittance, kicked the door down, went into the bedroom where deceased and Gussie Lee were, and fired three shots into the ceiling. The next afternoon defendant went back to deceased's apartment to talk to Gussie Lee. They were outside talking when deceased returned and invited them to come inside to finish their conversation. Gussie Lee and defendant were in the bedroom talking when, at some point, defendant went into the living room where deceased was playing records and shot him three or four times. Brandon Childress, a friend of Gussie Lee, was also present in the living room at the time of the shooting. After the shooting defendant walked around for a while, telephoned several people and told them he had shot deceased, and then turned himself in at the Macon County sheriff's office.

However, some of the evidence relating to the circumstances surrounding the shooting is conflicting. Defendant testified that he had had a dispute with Gussie Lee over some furniture she had taken from his house. The night before the shooting he went to deceased's apartment to talk to Gussie Lee and to try to get his furniture back. He fired the shots into the ceiling because deceased reached for his pants and defendant thought he might have a gun. Defendant put his gun away when he realized deceased was not armed.

Earlier in the afternoon of the shooting, deceased went to defendant's house to discuss Gussie Lee and the furniture. He told defendant, "You don't need to get a gun because I don't have mine on me, I left mine at home." Deceased also told defendant that he was going to bring back all of the furniture that Gussie Lee had taken and that defendant should go get things straightened out with Gussie Lee. Defendant's friend Alonzo Warren testified that he was present during this conversation and corroborated defendant's testimony that deceased said he had left his gun at home.

Defendant further testified that when deceased invited him into the apartment just before the shooting, he saw deceased checking a revolver and placing it in his right front pocket. Then while defendant was still talking to Gussie Lee, some words were exchanged with deceased and "he reached for his pocket and I already had my hand in my pocket, I was standing there talking to him and when he reached for his pocket I fired." On cross-examination defendant stated that what had happened was that he went into the living room and told deceased he wanted his furniture back. Deceased responded with a profanity and reached quickly for his pocket, at which time defendant pulled his gun out of his back pocket and fired. The shots were almost together. On redirect he stated that his feeling when deceased reached for his pocket was that he (defendant) was going to die.

Defendant also testified on cross-examination that in an earlier confrontation in which he caught Gussie Lee and deceased taking away some of his furniture, deceased acted as though he had a gun in his pocket, although defendant did not actually see a gun that time.

Defendant further stated that he was upset when Gussie Lee left him but that he never intended to shoot deceased and never told Gussie Lee he was going to shoot him. He said he could not recall what he told the police officers after he turned himself in but denied changing his story.

However, evidence was presented indicating that defendant's testimony at trial was at variance with statements he made to police officers after turning himself in. A deputy sheriff testified that he was on duty when defendant turned himself in and that while he was taking defendant to the jail, defendant said, "I didn't mean to kill that guy" and started crying. A short time later the deputy turned defendant over to two detectives from the Decatur Police Department who transported him to the city jail. One of the detectives recalled that defendant told them that he had been hurt over a woman and that before he shot deceased, he told him he was sorry but he just had to do it. Defendant also told the detectives that he decided to turn himself in because he had done wrong. He did not mention to them that he thought deceased might have had a gun.

The booking officer at the city jail testified that while he was booking

defendant, defendant said, "You know I'm sorry. I told that dude I'm sorry man, but I got to shoot you."

Two other detectives testified that they interviewed defendant after he had been taken to the city jail. He told them about the shooting but did not mention that he thought deceased might have had a gun. However, when the detectives later went over the statement with defendant, he told them that deceased had had his hands in his pockets and defendant thought he might have had a gun. Later in the evening defendant asked to make a written statement, which was witnessed by the two detectives.

On cross-examination one of the detectives stated that defendant said he thought deceased had a gun because when deceased came to defendant's house earlier in the day, he indicated he had a gun then. He told defendant that he did not have a gun when defendant broke into his apartment the night before; otherwise he would have shot defendant when he kicked the door in. On redirect, the detective testified that defendant never told him he had ever actually seen a gun in deceased's possession.

In his written statement, which was also admitted into evidence, defendant gave the following account of the shooting:

"I went to John['s] house last night and we got into a hass[le] then today he came into my house and told me that I shouldn't have kicked in his door or fired my gun in his house. He also said that he gave his pistol to his sister last night and he had it on him. I asked him could I go back into his house and talk to Gussie which I only wanted to do, he said that I could and that he didn't mind. He said he wasn't going right home but it was OK if I went on. I was [there] awhile then he came home and I was in the hall talking to Gussie and he asked me to come in so I did. After I had talked to Gussie awhile longer he said something to me and I said something to him. (I don't remember just what we said to each other) but he put his hand in his pocket and I acted too fast and I fired. I fired three times. I think I hit him twice in the face and once in the chest."

Defendant's testimony was also somewhat inconsistent with that of other witnesses. Gussie Lee testified that the night before the shooting defendant asked her to come back to him and, when she refused, said that he was going to kill deceased. She also testified that deceased did not have a gun that night when defendant forced his way into the apartment and fired shots into the ceiling. She did not hear any conversation between defendant and deceased just before deceased was shot.

Brandon Childress testified that she was asking deceased to help her find a record when he was shot. She did not hear any conversation

between defendant and deceased before the shooting or see any gun in deceased's possession.

A police detective testified that he went to deceased's apartment at about 4:10 p.m. to investigate the shooting. He and other officers at the scene searched the apartment but found no gun on deceased or in the apartment. On cross-examination he stated that they did not look for a gun outside the apartment or ask any of the bystanders about a gun.

At the instructions conference defense counsel tendered the following instruction on justifiable use of force in self-defense in the language of IPI 24.06, which was refused:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

However, the following instructions on murder and voluntary manslaughter were given:

> "A person commits the crime of murder who kills an individual if, in performing the acts which cause the death, he intends to kill or do great bodily harm to that individual; or knows that such acts create a strong probability of death or great bodily harm to that individual." IPI 7.01.
>
> "To sustain the charge of murder, the State must prove the following propositions:
>
> First: That the defendant performed the acts which caused the death of John Lewis Rice;
>
> Second: That when the defendant did so, he intended to kill or do great bodily harm to John Lewis Rice, or he knew that his acts created a strong probability of death or great bodily harm to John Lewis Rice.
>
> If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.
>
> If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty." IPI 7.02.
>
> "A person commits the crime of voluntary manslaughter who intentionally or knowingly kills another if, at the time of the killing, he believes that circumstances exist which would justify the killing,

but his belief that such circumstances exist is unreasonable." IPI 7.05.

"To sustain the charge of voluntary manslaughter the State must prove the following propositions:

First: That the Defendant intentionally or knowingly performed the acts which caused the death of John Lewis Rice; and

Second: That when the Defendant did so he believed that circumstances existed which would have justified killing John Lewis Rice; and

Third: That the Defendant's belief that such circumstances existed was unreasonable.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the Defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the Defendant not guilty." IPI 7.06.

In giving the voluntary manslaughter instructions on unreasonable use of force and refusing the self-defense instruction, the trial court apparently concluded that while there was evidence that defendant may have had a belief in the need to use deadly force, there was no evidence that the belief was a reasonable one.

However, in *People v. Dowdy*, 21 Ill. App. 3d 821, 316 N.E.2d 33, although two eyewitnesses testified that defendant deliberately shot the unarmed deceased twice and the only evidence of self-defense was defendant's testimony that earlier deceased had hit her and that just before she shot him he "drawed [*sic*] back his fist at [her]" (21 Ill. App. 3d 821, 824, 316 N.E.2d 33, 35), the reviewing court held that a self-defense instruction should have been given, stating that "[w]hile it is true * * * that a jury very likely might not accept [defendant's] version, her credibility is for the jury and can only be resolved by it, not by the court" (21 Ill. App. 3d 821, 826, 316 N.E.2d 33, 36). In that case no voluntary manslaughter instruction on unreasonable use of force had been given either, and the court indicated that upon retrial such an instruction should be given along with the self-defense instruction.

In the instant case, defendant testified that on earlier occasions deceased had acted as though he had a gun, that a few minutes before the shooting defendant had seen deceased put a gun in his pocket, and that deceased was reaching for his pocket when defendant shot him. This version of the circumstances surrounding the shooting, if believed, would support a finding of a reasonable belief that the use of deadly force in self-defense was justified even though deceased actually turned out to be

unarmed at the time of the shooting. Even though the evidence of a reasonable belief was contradicted by other evidence and might not be believed by the jury, still, as *Dowdy* points out, the defendant's credibility is a matter for the jury to resolve.

Moreover, it is difficult to conceive of a situation where there would be evidence of a belief that deadly force was justified but where the evidence would be such that the issue of the reasonableness of that belief should not be submitted to the jury, and such a situation does not appear to have been contemplated by the drafters of IPI Criminal. In discussing sample sets of instructions, chapter 27.00 of IPI Criminal proposes that set No. 27.01 be used where defendant is indicted for murder, he testifies that he acted in self-defense, and there is evidence of voluntary manslaughter (unreasonable use of force). Such was the situation here. The suggested format of set No. 27.01 is to give IPI 7.01 and 7.05 as given here but also to give IPI 24.06 defining justifiable use of force. IPI 7.02 is to be combined with IPI 25.05, which requires the State to negate the defense of justifiable use of force beyond a reasonable doubt. IPI 7.06 is to be given as given here. This format completely explains to the jury the issues involved. As instructed here, however, the jury was required by IPI 7.06 to determine if defendant believed he was justified in using the force he used but his belief was unreasonable, but lacking IPI 24.06, was not advised as to the circumstances under which the use of force in self-defense is justified.

The State contends that, even if error, the failure to give IPI 24.06 was harmless because, since the jury found defendant guilty of murder, they did not find even an unreasonable belief that deadly force was justified in self-defense. In *People v. Johnson,* 1 Ill. App. 3d 433, 274 N.E.2d 168, the converse situation where the self-defense instruction was given, the voluntary manslaughter instruction on unreasonable use of force was refused, and defendant was found guilty of murder was held to be reversible error. The rationale for the ruling was that since the jury was only given the alternative of reasonable belief or no belief and was not instructed to consider whether there was a belief, albeit an unreasonable one, the verdict of guilty of murder may only have indicated a finding that there was no reasonable belief, not that there was no belief at all.

Although we have found no decisions discussing the situation presented in the instant case, there are several reasons why it cannot be assumed that the verdict of murder indicates that the jury did not find even an unreasonable belief. As given here, the issues instructions on murder (IPI 7.02) and voluntary manslaughter (IPI 7.06) instructed the jury that if they found that defendant performed the acts which caused the death of deceased and that when defendant did so, he intended to kill or do great bodily harm to deceased, or knew that his acts created a strong probability of death or great bodily harm to deceased, they were to find

defendant guilty of murder unless he had an unreasonable belief that deadly force was justified. Under these instructions, if the jury found that defendant intended to kill deceased and did kill him, but had a *reasonable* belief that deadly force was justified, they were offered no alternative but to find defendant guilty of murder.

In addition, as mentioned above, IPI Criminal proposes that, when the issue of justifiable use of force has been raised and instructions on voluntary manslaughter and self-defense are to be given, the issues instruction on murder (IPI 7.02) be modified to include paragraphs from IPI 25.05 instructing the jury that in order to find defendant guilty of murder they must find beyond a reasonable doubt "that the defendant was not justified in using the force which he used" and "that the defendant did not believe that circumstances existed which justified the use of the force which he used." (See IPI Criminal, at 435-36, 460.) Since this was not done in the instant case, there was no basis in the instructions for assuming that the jury's verdict of murder indicated that it had found *beyond a reasonable doubt* that defendant did not have even an unreasonable belief that deadly force was justified.

The State also contends that the evidence shows that defendant was the aggressor and cites cases stating that aggressors may not claim self-defense *(People v. Kelly,* 8 Ill. 2d 604, 136 N.E.2d 785; *People v. Williams,* 56 Ill. App. 2d 159, 205 N.E.2d 749). However, the evidence in the instant case indicates that the aggressor issue would be a matter for the jury to decide. It is undisputed that defendant was in deceased's apartment at deceased's invitation. There was no evidence of any altercation between defendant and deceased earlier on the afternoon of the shooting or just prior to the shooting. Defendant's testimony, whatever its credibility, was that deceased reached for his pocket before defendant shot him.

For the reasons stated above, we conclude that the judgment must be reversed and the cause remanded for another trial.

■■ Since defendant may be retried we must also consider his contention that the trial court erred in refusing to suppress his oral statements to police officers. He argues that the statements should have been suppressed because not all material witnesses to the statements testified at the hearing on the motion to suppress.

At the hearing, the deputy sheriff to whom defendant turned himself in, the two detectives who transported defendant from the sheriff's office to the city jail, the booking officer, and the two detectives who later interviewed defendant all testified. The substance of their testimony concerning the circumstances of defendant's oral statements was that although he appeared distraught and cried at times, he was coherent and seemed to understand when his rights were explained to him. There were no signs of intoxication, and he did not appear to be in shock. However, several of the witnesses testified that the two command officers who were

on duty that day were also present in the booking room while defendant was being booked, at which time defendant purportedly made several statements to the effect that he shot deceased and that before he shot deceased he told him he was sorry but he had to do it. The booking officer testified that the command officers were a few feet away from defendant at the time and that he did not know whether they were able to hear what defendant said. After the six police officers had testified, the assistant State's attorney stated that he had not called the two command officers who had been present in the booking room because they had not heard anything and had not had any contact with defendant.

Defendant then testified that he remembered talking to the various police officers but could not remember what was said. He was very nervous and thoughts were rushing through his head. He was not under the influence of alcohol or narcotics. None of the police officers mistreated him in any way.

At the close of the hearing defense counsel objected to the failure of the State to call the two command officers as witnesses, but the motion to suppress was denied.

Section 114—11 (d) of the Code of Criminal Procedure (Ill. Rev. Stat. 1973, ch. 38, par. 114—11(d)) provides that once the voluntariness of a statement is called into question by a defendant, the State has the burden of proving that the statement was voluntary. In addition, the Supreme Court has long held that in order to meet its burden the State must produce all witnesses material to the making of the statement or explain their absence. *People v. Armstrong,* 51 Ill. 2d 471, 282 N.E.2d 712.

However, all of the cases which have held that statements should have been suppressed on the basis of the material witness rule appear to have done so in the context of alleged coercion. (See, *e.g., Armstrong; People v. Wright,* 24 Ill. 2d 88, 180 N.E.2d 689; *People v. Thomas,* 22 Ill. App. 3d 854, 318 N.E.2d 342; *People v. Scott,* 13 Ill. App. 3d 620, 301 N.E.2d 118.) Even where coercion has been alleged, the Supreme Court has consistently held that a witness who was not present when the alleged coercion was said to have taken place is not a material witness. *(In re Lamb,* 61 Ill. 2d 383, 336 N.E.2d 753; *People v. Golson,* 32 Ill. 2d 398, 207 N.E.2d 68; *People v. Joe,* 31 Ill. 2d 220, 201 N.E.2d 416; *People v. Freeman,* 25 Ill. 2d 88, 182 N.E.2d 677; *People v. Sims,* 21 Ill. 2d 425, 173 N.E.2d 494.) Similarly, an appellate court has held that the material witness rule did not apply to the giving of the *Miranda* warnings where there was no contention of coercion. *People v. Richardson,* 21 Ill. App. 3d 859, 316 N.E.2d 37.

■■ In the instant case, defendant's motion to suppress did not allege coercion; rather, it stated that because defendant was in a state of shock he did not knowingly waive his *Miranda* rights. Moreover, defendant

814

testified at the hearing that he had not been mistreated by any of the police officers. Since no coercion was alleged and no evidence of coercion was presented, we conclude that the two command officers were not material witnesses whose testimony was required and that therefore defendant's motion to suppress was properly denied.

For the reasons expressed herein, the judgments of conviction and sentence are reversed and the cause is remanded to the Circuit Court of Macon County for a new trial.

Reversed and remanded.

CRAVEN, P. J., and REARDON, J., concur.