2021 IL App (1st) 182372-U

No. 1-18-2372

September 14, 2021

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 7168 |
| | ) | |
| TONY BRAWLEY, | ) | Honorable |
| | ) | Vincent M. Gaughan |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

ORDER

¶ 1    *Held*: Defendant's conviction for second degree murder is affirmed because a reasonable factfinder could conclude he did not act in defense of another. Defendant's sentence is not excessive where it is within the statutory range and defendant does not show that the court failed to consider mitigating evidence and his rehabilitative potential.

¶ 2    Following a bench trial, defendant Tony Brawley was found guilty of second degree murder (720 ILCS 5/9-2(a)(2) (West 2016)) and sentenced to 11 years' imprisonment.[1] Defendant argues on appeal that the State failed to prove beyond a reasonable doubt that he was not justified in acting in defense of another. Defendant further argues that his sentence is excessive because the trial court failed to adequately consider mitigating evidence and his rehabilitative potential. We affirm.

¶ 3    Defendant was charged by indictment with six counts of first degree murder (720 ILCS 5/9-1(a) (West 2016)) for shooting and killing Sergio Zaragoza. The State nol-prossed counts I-IV. Count V charged defendant with intentionally or knowingly shooting and killing Zaragoza (720 ILCS 5/9-1(a)(1) (West 2016)) and count VI charged defendant with shooting and killing Zaragoza knowing that his conduct created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2016)).

¶ 4    Before trial, defendant raised the affirmative defenses of self-defense and defense of others. Defendant also filed a motion *in limine*, pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), to introduce evidence of prior violent acts by Zaragoza and another individual present during the incident, Luis Cruz. Following a hearing, the court granted defendant's motion as to three prior instances for Zaragoza and three prior instances for Cruz.

¶ 5    Neil Chamness testified that, around 1 p.m. on September 11, 2016, he went with his wife and three-year-old son to the home of Gabriel Moskolis on the 1600 block of North Karlov Street, in Chicago, for a barbecue and to watch a football game. Chamness, his wife, and some other

---

[1] Throughout the record, defendant's last name is spelled as both Brawley and Browley. In this order, we adopt the spelling from his notice of appeal.

attendees sat on the front porch. On Chamness's left sat a man wearing dark jean shorts and a blue T-shirt.

¶ 6     Around 3:07 p.m., two men approached the home. They entered the front gate, and one threw a punch at a woman sitting on the porch stairs. Chamness did not see if the punch connected. The man who had been sitting on Chamness's left then descended the stairs, drew a firearm, and fired one shot, hitting the man who threw the punch. After firing the shot, the man ran up the stairs and through Moskolis's apartment on the first floor. Chamness took his wife and son into the bathroom in Moskolis's apartment in case other people began shooting. The three then exited the bathroom, heard sirens, and returned to their home nearby. On the way, Chamness told a police officer what he had seen. The court asked whether anyone else at the party or the two individuals who approached the house had weapons, and Chamness denied that he saw any other weapons at the barbecue.

¶ 7     On September 18, 2016, Chamness met with police officers and viewed a photograph lineup. At trial, Chamness identified People's Exhibit Nos. 4 and 5 as the advisory form he signed and the photo array he viewed. Chamness identified the person in the top middle photograph as the shooter, and identified that person in court as defendant. Chamness had never previously met defendant or the person he shot.

¶ 8     On cross-examination, Chamness testified that approximately four or five men, five or six women, and some children were in the front yard of the house when he arrived. The front yard was enclosed by a wrought iron fence. Chamness denied that he saw anyone in the yard "signal" to the two men who entered the front gate, but agreed that he heard someone "comment" to them. Chamness did not know the woman sitting on the steps, and she did not speak or make any

movement toward the man who tried to punch her. Chamness could not tell whether the man made contact with the woman, but she fell back. Defendant then descended the steps and confronted the man who swung at the woman. After the shooting, when Chamness left the apartment, he saw the man who had been shot lying on the ground and bleeding. He did not see the other man who had been with him and did not know where that man went.

¶ 9    Defense counsel asked if Chamness told the officer that he saw the man take two swings at the woman, and Chamness responded that he recalled one punch, but perhaps he recalled two punches when he spoke with the officer. Chamness did not know if the officer took notes.

¶ 10    On redirect examination, Chamness agreed that the woman fell back when the man swung his fist at her, but Chamness did not remember her falling to the ground. Chamness did not hear any more shots after he entered the apartment, or see anyone with a weapon when he left.

¶ 11    Chicago police detective Joseph Marszalec, who administered the photo array to Chamness, testified that Chamness identified defendant as the shooter, and identified People's Exhibit Nos. 4 and 5 as the advisory form and photo array he showed Chamness.

¶ 12    Moskolis testified that, on September 11, 2016, he lived on the first floor of a two-flat apartment building on the 1600 block of Karlov. A person named Israel lived in the second-floor apartment with his wife or girlfriend and two children. On September 11, 2016, Moskolis and Israel hosted a barbecue for a football game. People began gathering on the porch and in the gated front yard between 11 a.m. and noon. Chamness's family were the only people Moskolis knew.

¶ 13    Moskolis spent most of the barbecue inside his apartment watching the game. He could see out the front windows. Israel and defendant, whom Moskolis had never previously met and identified in court, entered Moskolis's apartment to use the restroom. Defendant returned outside,

and Moskolis could see him on the porch through the windows. Chamness, his wife, and his son spent most of the barbecue on the front porch.

¶ 14     Around 3:07 p.m., Moskolis was in his apartment and heard what sounded like one gunshot, screaming, and yelling. The gunshot came from right outside the open front window. Moskolis ran to the windows to see what happened. Defendant entered through the front door and proceeded down the hallway; Moskolis assumed he exited through the back door. Chamness and his wife and son then entered the apartment and went into the restroom. Moskolis locked all the doors to the house. Moskolis did not see defendant when he locked the back door, and never saw defendant again. Chamness and his wife told Moskolis what happened and left. Police officers arrived, and Moskolis spoke with them.

¶ 15     On September 24, 2016, Moskolis spoke with a detective, who showed Moskolis a photograph lineup. Moskolis identified the advisory form and accompanying lineup as People's Exhibit Nos. 6 and 7. Moskolis circled defendant's photo and told the detective that defendant entered the apartment to use the restroom, and after Moskolis heard the gunshot, re-entered the apartment and, Moskolis believed, exited through the back.

¶ 16     On cross-examination, Moskolis testified that the front yard was surrounded by a wrought iron fence separating it from the sidewalk. Moskolis did not see defendant with a weapon when defendant entered Moskolis's apartment to use the restroom or after the shooting when defendant ran through the apartment.

¶ 17     The State entered a stipulation that the detective who administered the photograph lineup to Moskolis would identify People's Exhibit Nos. 6 and 7 as the advisory form and photo array,

and testify that Moskolis identified the person in position number four as the person who ran through his apartment after the shooting.

¶ 18    Andrew Lepkowski, a paramedic with the Chicago Fire Department, testified that he was dispatched to a call of a gunshot wound at approximately 3:09 p.m. on September 11, 2016. He arrived at the home approximately two minutes later. An adult male was lying on his back on the sidewalk surrounded by 15 to 20 people. The scene was "chaotic," with people yelling, screaming, arguing, and possibly touching the victim.

¶ 19    Lepkowski approached the man, whom he later learned was Zaragoza. Zaragoza had a single gunshot wound on the left side of his chest. In the ambulance, Lepkowski noticed an exit wound below Zaragoza's left shoulder blade. The paramedics took Zaragoza to a hospital. Lepkowski did not notice any weapons around Zaragoza while on the scene or recover any weapons from his body.

¶ 20    On cross-examination, Lepkowski confirmed that the crowd was "rowdy" and "frantic." Approximately 10 or 15 people were there. Lepkowski did not recall anyone touching Zaragoza, but stated it was possible, and agreed that someone could have removed something from where Zaragoza lay before Lepkowski arrived. On redirect examination, Lepkowski denied seeing anyone remove anything from Zaragoza.

¶ 21    Chicago police detective Ruben Weber testified that he investigated the shooting and learned that the suspected shooter was the boyfriend of Yaritza Rosario. An address associated with Rosario listed defendant as another possible resident. From a police database, Weber obtained a photograph of defendant, whom he identified in court. Weber then saw photographs of defendant and Rosario together on Facebook.

¶ 22    On cross-examination, Weber testified that he did not interview Rosario or another individual, Erick Salgado, even though a report listed Salgado as a witness and included his address. Weber interviewed Cruz on October 1, 2016, but did not arrest him for battering Rosario or planning an attack on her.

¶ 23    The State entered a stipulation that an evidence technician would testify he arrived at the scene around 5:01 p.m. on September 11, 2016, at which time the scene had been taped off and secured, and he filmed and photographed the area. The technician recovered swabs from suspect bloodstains, then went to the hospital, photographed Zaragoza's body, and fingerprinted him.

¶ 24    Lastly, the State entered a stipulation that Dr. Matthew Fox, an assistant Cook County medical examiner, would testify that he examined Zaragoza's body, did not recover a projectile, and determined that Zaragoza died of a gunshot wound to the chest and that the manner of death was homicide. Defense counsel added that Defense Exhibit No. 1, an amended toxicology report, showed that Zaragoza's ethanol level of the vitreous humor was 140 and his cavity blood was 107.

¶ 25    Defense counsel called Rosario, who testified that, on September 11, 2016, she and defendant had been dating for four years. Around noon that day, Rosario and defendant went to her brother Israel's house, on Karlov, for a barbecue. Salgado lived next door and also attended the barbecue.

¶ 26    Rosario had a daughter with Isaac Rojas, also known as "Convict D." Rojas dropped off their daughter at the barbecue and drove away. Shortly thereafter, Rosario saw a green Blazer or "Jimmy truck" circle the block a few times. Rosario did not recognize the vehicle.

¶ 27    About an hour later, Rosario heard someone ask if she was "Convict D's baby momma[.]" Rosario turned and saw Zaragoza, who had asked the question, and Cruz. Rosario knew them;

Cruz, Zaragoza, and Rojas had all been "Young Latino Organized Disciples" (YLOD), but Rojas was no longer in the gang. Rosario thought Cruz had a firearm. Defendant was approximately 10 feet away. Zaragoza then punched Rosario in the back of the head and kicked her, and she crawled up the stairs and heard a gunshot. Rosario was 5'2" and weighed 140 pounds.

¶ 28    On cross-examination, Rosario testified that she and defendant were still in a relationship at the time of trial. Defendant was close with her family and daughter. Rosario and defendant sometimes stayed together, and financially and emotionally depended on each other. Defendant and Rojas did not like one another. Defendant did not know the other members of the YLOD gang. Rosario agreed that Rojas was "on the run" from his former gang and Zaragoza.

¶ 29    Rosario and defendant drove her vehicle from their apartment to the barbecue and parked in front. Rosario did not see defendant bring a firearm or know that he had one. Rosario drank a few beers between noon and 3 p.m., but defendant did not drink. Rosario confirmed that, while Rojas dropped off his and Rosario's daughter, Rojas "got into it" with defendant before leaving.

¶ 30    Rosario was walking up the stairs when she heard Zaragoza. Zaragoza was between the bottom of the stairs and the first step, and Rosario was on the second step. She turned and saw Zaragoza already swinging. Rosario also saw Cruz a few feet away, holding a black firearm on his waistband. Cruz was on Zaragoza's right side. Rosario grew frantic and quickly turned back around, and Zaragoza punched her in the back of the head. She fell on the stairs. Zaragoza hit her "a couple times," mostly in the head, and kicked her body. She tried to crawl up the stairs into the house. Defendant was on the porch, a few feet from her.

¶ 31    Rosario freed herself from Zaragoza, then heard a gunshot, but she did not look to see where it came from. She entered Moskolis's apartment, grabbed her keys, and exited the front

door. She left without speaking to anyone and left her daughter, who had run upstairs, with her brother. As she walked to her vehicle, she saw Zaragoza on the ground where he had been when he hit her.

¶ 32    Rosario went to a friend's house. Defendant arrived a little while later. They discussed what happened, but not in detail. Rosario never saw defendant's firearm. Rosario suffered bumps on her head and bruises but did not photograph her injuries, go to the hospital, or see a doctor. She did not wait for a paramedic after the shooting because she feared the gangs. Rosario and defendant lived together until January 2017, when defendant was arrested. Rosario learned defendant's charges, but never spoke with the police or told them that Cruz had a firearm.

¶ 33    On redirect examination, Rosario confirmed that there was a "shoot-on-sight" for Rojas from Cruz and Zaragoza's gang. Defendant knew about the shoot-on-sight.

¶ 34    On recross examination, Rosario testified that, because of the shoot-on-sight for Rojas, she and her daughter were in danger from other gang members when they were around Rojas, including Cruz and Zaragoza. Rosario told defendant about the danger prior to September 11, 2016, and defendant knew that Cruz and Zaragoza were looking for Rojas. Rosario denied that she would be in less danger if Zaragoza or Cruz were killed, because there were more gang members.

¶ 35    Cruz testified that he saw Zaragoza almost every day. Cruz denied that he and Zaragoza were in the same gang, stating that he was a Latin Disciple and Zaragoza was an "SD."

¶ 36    On September 11, 2016, Zaragoza picked up Cruz and a woman in a Chevrolet Blazer, and they drove around and drank. They drove past the home on the 1600 block of Karlov and saw people on the porch. Cruz did not know who lived there. Cruz confirmed that Zaragoza told him

he did not like Rosario and Salgado, who was in the same gang as Cruz. Zaragoza wanted to stop but they left, went to the liquor store, and then picked up a woman named Laura.

¶ 37 The group returned to the house on Karlov to beat up Salgado. They parked down the street and Zaragoza and Cruz exited the vehicle, while the women remained inside.

¶ 38 When Zaragoza and Cruz arrived at the house, the gate was open. No one invited them to the barbecue or waved them over. Cruz did not see Salgado. Zaragoza hit Rosario, and Rosario's brother got "involved." Cruz did not know if Rosario said anything to Zaragoza before he hit her. Rosario was standing, Zaragoza hit her one time, and Rosario did not fall backwards.

¶ 39 Cruz confirmed that, after "the incident," he ran back to the vehicle and then returned to the scene, where an officer later placed him in a police vehicle. Cruz did not tell the officer that he arrived with Zaragoza, but did tell the officer that he was there when Zaragoza punched Rosario. Later that day, Cruz spoke with Weber, but did not tell Weber that he arrived with Zaragoza, that he was there when Zaragoza attacked Rosario, or that they went there to beat up Rosario or Salgado. Responding to a question from the court, Cruz confirmed that he told Weber he was walking by the yard when he heard a gunshot.

¶ 40 Cruz testified that, on February 20, 2009, Zaragoza was arrested for attempting to stop a police officer from arresting Cruz. Cruz was also with Zaragoza when Zaragoza was arrested on July 29, 2009, but Cruz denied seeing Zaragoza throw flammable liquid at a vehicle during that incident.

¶ 41 On cross-examination, Cruz testified that neither he nor Zaragoza had a firearm when they approached the house on September 11, 2016. When Zaragoza struck Rosario, Rosario's brother tried to hit Zaragoza but Cruz pushed him off. Cruz saw a person on the porch stand, draw a

firearm, and aim at them. Cruz touched Zaragoza's chest, told him to watch out, ducked, and exited the gate to the sidewalk. Cruz stopped when he only heard one gunshot, but did not see who was shot or where the shooter went. Cruz returned to the Blazer, told one of the women to call the police, returned to the house, and held Zaragoza. After a few minutes, Cruz saw Salgado and they fought. Police officers arrived and separated them.

¶ 42    On redirect examination, Cruz testified that, after officers separated him and Salgado, they put Cruz in the back of a police vehicle and interviewed him. The officers did not ask Cruz to take them to the vehicle he arrived in. Officers did not impound the Blazer and Cruz did not know if they searched it.

¶ 43    Defense counsel entered a stipulation that a police officer would testify that he arrested defendant without incident at defendant's place of employment on January 9, 2017. Defense counsel then entered certified copies of convictions for Zaragoza for robbery in 2007 and resisting a peace officer in 2009, and for Cruz for battery in 2005 and battery causing great bodily harm in 2010.

¶ 44    In rebuttal, the State called Laura Calvillo, who testified that Zaragoza and Cruz picked her up from work at 2:57 or 2:58 p.m. on September 11, 2016. Zaragoza was her ex-boyfriend, and she had known Cruz for about a year. Another woman she had never met was also in the vehicle. Calvillo sat in the front passenger seat, and Cruz and the other woman sat in the back. Calvillo did not see Zaragoza with a weapon.

¶ 45    Zaragoza parked near the 1600 block of Karlov, and he and Cruz exited the vehicle and said they would be right back. Within a minute, Calvillo heard "a big boom," and Cruz returned to the vehicle and told her to call an ambulance because Zaragoza had been shot. Calvillo called

911, then exited the vehicle, ran to Zaragoza, and held his hand. Based on Calvillo's indications in the courtroom, the State noted that the vehicle was approximately 30 feet from Zaragoza. Calvillo did not know what Cruz did while she held Zaragoza. Calvillo never saw Cruz with a firearm, and did not see a firearm on Zaragoza's person or the ground around him.

¶ 46 On cross-examination, Calvillo testified that she had known Zaragoza for about three years. Calvillo had been friends with Zaragoza's sister for 12 years and called her when she learned Zaragoza was shot. Calvillo never saw Cruz lift his shirt, reach for his waistband, or hold a firearm. Calvillo was "in shock" when Cruz returned to the vehicle and told her what happened, and focused on getting Zaragoza help.

¶ 47 Following closing argument, the trial court found that the State proved the elements of first degree murder, but that defendant acted with an unreasonable belief that he was acting in defense of others, and therefore found defendant guilty of two counts of second degree murder.

¶ 48 Defendant filed a motion to reconsider or for a new trial, arguing in relevant part that the court erred in finding that defendant's belief his conduct was necessary to defend Rosario was unreasonable. The court denied the motion.

¶ 49 Defendant's presentence investigation report (PSI) showed that he was 39 years old on the date of the offense, was formerly involved with the Latin Kings gang, and had convictions in 1994 for murder, attempt murder, and aggravated battery with a firearm, and in 2012 for being a felon in possession of a firearm. Defendant was raised by his mother, was expelled after one month of high school when he was arrested and incarcerated, and earned a GED and 51 college credits while incarcerated. Defendant was employed at Tempel Steel from 2014 until his arrest for the instant offense.

¶ 50     At the sentencing hearing, the State entered victim impact statements from Zaragoza's brother and sister. The State also called Samantha Rodriguez, who testified that Zaragoza was her boyfriend and the father of her three children. Rodriguez read her victim impact statement, in which she called Zaragoza's death emotionally scarring and a "devastating experience" for her family, and stated that two of her children were attending therapy and struggling with the loss of their father.

¶ 51     Defense counsel entered letters from defendant's ex-girlfriend, cousin, and employer. Defendant's ex-girlfriend wrote that her son viewed defendant as a father figure. The letter from defendant's employer, Tempel Steel, indicated that defendant had worked there from November 2014 through January 2017, and received promotions in 2015 and 2016. Defendant's cousin wrote that, after defendant completed a 16-year term of incarceration that began when he was a teenager, he planned family events, raised another of their cousin's sons when the mother was imprisoned, enjoyed work, and kept gangs out of their grandmother's neighborhood.

¶ 52     In aggravation, the State argued that defendant's conduct caused serious harm and defendant's convictions for murder and for being a felon in possession of a firearm showed an inability to abide by society's rules. According to the State, it was necessary to deter others from committing similar crimes. In mitigation, defense counsel argued that Zaragoza and Cruz were the initial aggressors, defendant believed his conduct was necessary to stop the attack on Rosario, his prior murder conviction should be given less weight because he was 15 years old at the time, defendant gained his GED and college credits while incarcerated, and he was twice promoted quickly at work.

¶ 53    The court described the events as "a tragedy," noting that Zaragoza's children were left without a father, his family was suffering, and defendant's family was also losing someone. The court announced it would consider the factors in aggravation and mitigation, the facts of the case, the victim impact statements, defendant's chances for rehabilitation, and the letters submitted on defendant's behalf, and balance that evidence against what was best for society.

¶ 54    The court sentenced defendant to 11 years' imprisonment, but immediately vacated the sentence and allowed defendant the opportunity to speak in allocution. Defendant apologized to Zaragoza's family and stated that he wanted to continue working and helping his family. The court expressed appreciation for the concern defendant showed Zaragoza's family and loved ones, and again sentenced defendant to 11 years' imprisonment.[2] Defendant's motion to reconsider sentence was denied.

¶ 55    On appeal, defendant first argues that the State failed to prove beyond a reasonable doubt that he was not justified in defending Rosario with deadly force where he shot Zaragoza one time after Zaragoza and Cruz entered the yard uninvited, Zaragoza assaulted Rosario after asking if she was the mother of Rojas's child, and there was evidence that Zaragoza and Cruz had a shoot-on-sight for Rojas.

¶ 56    When a defendant challenges the sufficiency of the evidence, the reviewing court views the evidence in the light most favorable to the State and determines whether any rational factfinder could find the essential elements of the crime beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. It is the responsibility of the trier of fact to resolve conflicts in the testimony,

---

[2] The court did not announce that it was merging the counts, but the half-sheet and electronic docket reflect that the court merged count VI into count V.

weigh the evidence, and draw reasonable inferences from the facts. *Id.* The reviewing court will not retry the defendant and draws all reasonable inferences in favor of the prosecution. *Id.* The reviewing court will not reverse a conviction unless the evidence is so improbable or unsatisfactory that it raises a reasonable doubt as to the defendant's guilt. *Id.*

¶ 57    Defendant was charged with first degree murder, raised the affirmative defense of self-defense and defense of others, and was ultimately convicted of second degree murder.

¶ 58    A person commits first degree murder when he kills an individual without lawful justification and intentionally or knowingly performs the act which causes the death, or knows the act creates a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (2) (West 2016). A person's use of force against another is justified as self-defense where the person was not the initial aggressor and reasonably believed that the force was necessary to prevent either imminent death or great bodily harm to himself or another, or the commission of a forcible felony. 720 ILCS 5/7-1 (West 2016); *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995).

¶ 59    A person commits second degree murder when he commits first degree murder and, at the time of the killing, unreasonably believes the circumstances to be such that, if they existed, would justify or exonerate the killing. 720 ILCS 5/9-2(a)(2) (West 2016). This form of second degree murder is known as imperfect self-defense, and " 'occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable.' " *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 148 (quoting *Jeffries*, 164 Ill. 2d at 113).

¶ 60    To establish the affirmative defense, the defendant must present evidence supporting the elements of self-defense: (1) unlawful force was threatened against a person; (2) the person threatened was not the aggressor; (3) there was an imminent danger of harm; (4) the use of force

was necessary; (5) the person actually and subjectively believed a danger existed requiring the use of the force applied; and (6) the person's belief was objectively reasonable. *People v. Gray*, 2017 IL 120958, ¶ 50. If the defendant meets that burden, the burden of proof shifts to the State to prove beyond a reasonable doubt not only that the defendant committed first degree murder, but also that he did not act in self-defense, by negating any of the elements of self-defense. *Jeffries*, 164 Ill. 2d at 127-28. A trier of fact need not accept a defendant's contention he acted in self-defense; it is a question of fact, and the trier of fact may consider the probability of the defendant's account, the circumstances surrounding the crime, and other witnesses' testimony. *People v. Young*, 347 Ill. App. 3d 909, 920 (2004).

¶ 61    Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could find the State negated defendant's claim of defense of others. At trial, Chamness testified that a man approached Rosario on the porch steps and threw one or two punches at her, and defendant, who had been sitting on the porch, shot the man one time. Rosario, defendant's girlfriend, testified that Zaragoza asked if she was the mother of Rojas's child and attacked her. However, Rosario also testified that she had freed herself from Zaragoza and reached the top of the stairs when she heard a gunshot. There is no evidence that Zaragoza was armed. Moskolis testified that, after he heard a gunshot, defendant ran through his apartment.

¶ 62    A rational trier of fact could find that defendant's use of deadly force in response to Zaragoza punching Rosario was unjustified. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 61 ("To shoot someone in response to a punch is not reasonable self-defense or defense of others justifying such use of deadly force."). Further, given that Rosario had freed herself and reached the top of the stairs when she heard the gunshot, while Zaragoza was unarmed and at the bottom

of the stairs, a rational trier of fact could further conclude that Rosario was not in imminent danger of death or great bodily harm when defendant shot Zaragoza. See 720 ILCS 5/7-1(a) (West 2016) (deadly force justified only where there is imminent danger of death or great bodily harm). Lastly, Moskolis's testimony is evidence of flight, and flight is circumstantial evidence from which defendant's knowledge that he did not act in self-defense can be inferred and a self-defense theory can be refuted. *Harmon*, 2015 IL App (1st) 122345, ¶ 59.

¶ 63    While Rosario testified that Zaragoza hit her multiple times and kicked her, Chamness testified that Zaragoza threw only one punch and Chamness did not see it connect. Moreover, although Rosario testified that she saw a firearm in Cruz's waistband, neither Chamness nor Calvillo saw Cruz with a firearm, Cruz testified he did not have a firearm, and no evidence supported the inference that defendant believed Cruz or Zaragoza was armed. The trial court was charged with determining the witnesses' credibility and resolving conflicts in the testimony, and here, found that defendant's belief he was acting in defense of Rosario was unreasonable. See *Harris*, 2018 IL 121932, ¶ 26; see also *Young*, 347 Ill. App. 3d at 920 (whether defendant acted in self-defense is a question for the trier of fact). Further, though Rosario stated that defendant knew there was a shoot-on-sight for Rojas from his former gang, she also testified that she was in danger from the gang when she was with Rojas, who was not at the barbecue when Zaragoza and Cruz arrived. Consequently, a rational trier of fact could conclude that defendant had an objectively unreasonable belief that his use of deadly force was necessary to defend Rosario.

¶ 64    Defendant further argues that, even if he did not believe Zaragoza or Cruz were armed, Zaragoza was capable of inflicting great bodily harm to Rosario, who, defendant asserts, was much smaller than Zaragoza. Defendant notes that an assault with fists may justify the use of a deadly

weapon (*People v. Dowdy*, 21 Ill. App. 3d 821, 825-26 (1974)), and argues that even unarmed attacks may cause great bodily harm or imply an intent to kill or cause great bodily harm. Here, however, where Chamness and Cruz testified that Rosario did not fall down when Zaragoza punched her and Rosario testified that she had freed herself when she heard a gunshot, a rational trier of fact could conclude that defendant's use of deadly force was not justified. See *Harmon*, 2015 IL App (1st) 122345, ¶ 61 ("To shoot someone in response to a punch is not reasonable self-defense or defense of others justifying such use of deadly force.").

¶ 65    Accordingly, we conclude that a rational trier of fact could find that the State proved beyond a reasonable doubt that defendant's belief that deadly force was necessary was objectively unreasonable. Consequently, we decline to reverse defendant's conviction.

¶ 66    Next, defendant argues that his sentence is excessive because the trial court failed to adequately consider his mitigating evidence and rehabilitative potential.

¶ 67    When imposing sentence, the court must balance the seriousness of the defendant's offense with the goal of restoring the defendant to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 61. Substantial deference is given to the sentencing court because it is in a better position to observe the defendant and weigh factors such as the defendant's credibility, demeanor, and moral character. *People v. Snyder*, 2011 IL 111382, ¶ 36. A reviewing court will not substitute its judgment for the sentencing court's merely because it would have weighed the factors differently, and will not modify a sentence absent an abuse of discretion. *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010); see also *People v. Williams*, 2017 IL App (1st) 150795, ¶ 43 ("A sentence within statutory limits will not be deemed excessive unless it is

greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." (internal quotation marks omitted)).

¶ 68    Sentencing courts are presumed to have considered the mitigating factors presented, and that presumption may not be overcome without affirmative evidence that the court failed to do so. *Williams*, 2017 IL App (1st) 150795, ¶ 44. The seriousness of the offense is the most important factor (*People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002)), and the sentencing court is not required to weigh the seriousness of the offense less than the defendant's rehabilitative potential (*Alexander*, 239 Ill. 2d at 214).

¶ 69    Second degree murder is a Class 1 felony with a sentencing range of 4 to 20 years. 730 ILCS 5/5-4.5-30(a) (West 2016). Defendant's 11-year sentence is therefore excessive only if it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of his offense. *Williams*, 2017 IL App (1st) 150795, ¶ 43.

¶ 70    We conclude that the trial court did not abuse its discretion in imposing sentence. The court announced it considered the factors in mitigation and aggravation, the facts of the case, the victim impact statements, defendant's rehabilitative potential, and the letters submitted on defendant's behalf to balance against what was best for society. While defendant argues that he had been promoted twice in the two years prior to his arrest, helped financially support his ex-girlfriend and raise her son, apologized to Zaragoza's family, and that the sentencing court only briefly mentioned the mitigating factors and his rehabilitative potential, defendant does not provide affirmative evidence rebutting the presumption that the sentencing court considered the relevant mitigating evidence. To the contrary, the court described Zaragoza's death as "a tragedy," noted the hardships defendant's conduct caused his and Zaragoza's families, and expressed appreciation

for defendant's concern for Zaragoza's loved ones in allocution. *Id.* ¶ 44 (sentencing court presumed to consider mitigating evidence, and presumption not overcome without affirmative evidence court failed to do so).

¶ 71    While defendant further argues that the facts of his offense were mitigating because he acted under a strong provocation and his conduct was justified to defend Rosario (see 730 ILCS 5/5-5-3.1(a)(3), (4) (West 2016)), the seriousness of the offense is the most important factor to be considered (*Quintana*, 332 Ill. App. 3d at 109), and the court stated it considered the facts of the case. Defendant is, essentially, requesting that we reweigh the factors in aggravation and mitigation, which we will not do. *Alexander*, 239 Ill. 2d at 213. Accordingly, we affirm defendant's sentence.

¶ 72    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 73    Affirmed.